**Louis P. QUINTERO and Paula Quintero, Appellants,**

v.

**JIM WALTER HOMES, INC., Appellee.**

No. 13–84–452–CV.

Court of Appeals of Texas, Corpus Christi.

Dec. 31, 1985.

Rehearing Denied March 20, 1986.

Second Rehearing Denied April 17, 1986.

F.I. Gandy, Jr., Corpus Christi, for appellants.

Mike Mills, McAllen, for appellee.

Before NYE, C.J., and BENAVIDES and DORSEY, JJ.

## OPINION

NYE, Chief Justice.

Appellants Louis Quintero and Paula Quintero sued Jim Walter Homes, Inc., for violations of the Deceptive Trade Practices Act and the Consumer Credit Code. The Quinteros alleged that, during contractual negotiations for the purchase and construction of a new home, the salesman for Jim Walter Homes made misrepresentations about the quality of the home to their damage. A judgment for over $78,000 was initially entered in favor of the Quinteros. This was later set aside by the trial court and replaced by a take-nothing judgment. The Quinteros appeal the trial court's decision to set aside the judgment in their favor and seek to have the initial judgment reinstated.

In 1976, Jim Walter Homes contracted to build a home for Louis and Paula Quintero in a "good, substantial, and workmanlike manner." Dissatisfied with their new home, the Quinteros retained attorney Hector Gonzalez, who filed a lawsuit on their behalf in 1978. Because he had several hundred similar lawsuits pending against Jim Walter Homes, Gonzalez arranged for another attorney, the Honorable Francis Gandy, to actually try the Quintero case, with the Quinteros' consent. Attorney Gandy successfully recovered a jury verdict in favor of the Quinteros on April 20, 1981. A judgment on the verdict was entered on May 27, 1981, for $78,385.65. The judgment also released the Quinteros from their installment note debt to Jim Walter Homes in the principal sum of $38,424.40.

In the meantime, attorney Gonzalez negotiated an aggregate settlement with Jim Walter Homes on behalf of 349 of his clients for $1.8 million dollars. This was to be divided among his clients according to a formula devised by attorney Gonzalez and overseen by Jim Walter Homes' legal staff. On June 11, two weeks after the judgment had been signed, attorney Gonzalez called the Quinteros to his office to discuss settling their case with Jim Walter Homes. Neither the Quinteros, nor Gonzalez, nor the attorneys for Jim Walter Homes were aware at that time that attorney Gandy had obtained the May 27 judgment. Only attorney Gandy, who had taken the time to check the file at the Courthouse, knew that the trial court had finally entered the judgment. He was unaware of and was not involved with the settlement negotiations between Jim Walter Homes and attorney Gonzalez.

As a result of a conversation with the office manager for attorney Gonzalez, the

Quinteros decided to go ahead and settle their claim against Jim Walter Homes. They agreed to join with all the other clients of Gonzalez and share in the settlement and signed a release of their claims against Jim Walter Homes. A joint motion to dismiss the Quinteros' suit was signed by attorney Gonzalez and by Jim Walter Homes' attorney on June 11, 1981. Under the terms of this settlement agreement, the Quinteros were to receive about $3900.00 cash and certain deductions on their note payable to Jim Walter Homes. The total value of their part of the settlement was $13,687.00.

On June 22, 1981, Gandy informed the Quinteros of the May 27, 1981, judgment in their favor. The Quinteros immediately notified the trial court that they disproved of the settlement and release and were revoking Gonzalez' authority to represent them any further.

Although the attorneys for Jim Walter Homes knew that the Quinteros no longer consented to the joint motion to dismiss, they nonetheless filed the consent dismissal motion with the trial court. Pursuant to the motion, the trial court (impliedly) set aside its first judgment, favorable to the Quinteros, and entered a new judgment on August 18, 1981, which dismissed their suit against Jim Walter Homes.

The Quinteros appealed the dismissal of their case to this Court in *Quintero v. Jim Walter Homes, Inc.*, 648 S.W.2d 746 (Tex. App.—Corpus Christi), *rev'd*, 654 S.W.2d 442 (Tex.1983). That initial appeal dealt solely with the procedural issue of whether a judgment of dismissal can be based on a joint motion to dismiss where one party has repudiated his consent to the joint motion. On writ of error, the Supreme Court held that a party has the right to revoke his consent to a joint motion to dismiss at any time before the rendition of judgment and that the trial court had therefore erred in granting the motion. *Quintero v. Jim Walter Homes, Inc.*, 654 S.W.2d 442, 444 (Tex.1983). Since the joint motion to dismiss was the only pleading before the trial court upon which a judgment of dismissal

could have been rendered, the Supreme Court ordered that the dismissal be set aside and remanded the case to the trial court to determine if Jim Walter Homes could plead and prove an enforceable settlement agreement under the release signed by the Quinteros.

On remand, the trial court concluded that the release was valid and enforceable, even though the Quinteros had revoked their consent, and entered a take-nothing judgment against the Quinteros on November 9, 1984. The Quinteros appeal that decision and seek reinstatement of the initial judgment in their favor of May 27, 1981.

In their last three points of error, the Quinteros allege that the trial court's conclusion was erroneous. They claim that since no one involved in the settlement negotiations knew of the judgment's existence, a "mistake of fact" existed which allows them to annul the release. Their argument tracks the general rule that a contract made under a mistake or ignorance of material facts is voidable and relievable in equity. *See, e.g., A.L.G. Enterprises v. Huffman*, 660 S.W.2d 603 (Tex. App.—Corpus Christi 1983), *modified*, 672 S.W.2d 230 (Tex.1984).

■ We overrule these last three grounds of error. The attorney who tried the case for the Quinteros, Francis Gandy, had knowledge of the judgment's existence several weeks before the Quinteros signed the release and settlement agreement. The knowledge of an attorney is imputed to his client. *Fonseca v. County of Hidalgo*, 527 S.W.2d 474 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.); *Dixon v. United States Fidelity & Guaranty Co.*, 293 S.W. 291 (Tex.Civ.App.—Texarkana 1926, writ dism'd w.o.j.). This knowledge includes not only that which an attorney knows, but also that which with due diligence he could have learned. *Texas Employers Insurance Association v. Wermske*, 349 S.W.2d 90 (Tex.1961); *Fonseca* at 479. With due diligence, Gonzalez easily could have learned of the entry of the judgment. Thus, one of the attorneys for the Quinteros knew, and the other

should have known of the judgment's existence at the time the Quinteros signed the release. As we noted in *Fonseca* at 479, "a party is as fully concluded by the acts of his attorney as if he were acting for himself. A Court will not set aside a judgment because of the negligence or mistakes of his attorney." The Quinteros' last three points are overruled.

In their first four points of error, the Quinteros allege that the release and settlement agreement were invalid because they were made in contravention of Disciplinary Rule 5-106 of the Texas Code of Professional Responsibility. Supreme Court of Texas, Rules Governing the State Bar of Texas art. XII, § 8 (Code of Professional Responsibility) DR 5-106 (1973). To this we agree.

The Quinteros contend that their attorney, Hector Gonzalez, violated Disciplinary Rule 5-106 of the Code, which provides:

(a) A lawyer who represents two or more clients shall not make or participate in the making of an aggregate settlement of the claims of or against his clients, unless each client has consented to the settlement after being advised of the existence and nature of all the claims involved in the proposed settlement, of the total amount of the settlement, and of the participation of each person in the settlement.

The trial court was correct in finding that Hector Gonzalez violated this rule. The Quinteros were not informed of the nature and settlement amounts of all the claims involved in the aggregate settlement, nor were they given a list showing the names and amounts to be received by the other settling plaintiffs.

It is noteworthy, too, that the Supreme Court in its earlier opinion in this case referred to DR 5-106 when discussing the aggregate settlement agreement. *Quintero v. Jim Walter Homes, Inc.*, 654 S.W.2d 442, 443 n. 1 (Tex.1983).

The Quinteros contend that since Gonzalez violated the Code of Professional Responsibility in the method by which he ac-quired their consent, the release and settlement agreement are void and unenforceable.

In *Fleming v. Campbell*, 537 S.W.2d 118 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.), the Houston Court addressed the enforceability of a contract formed in violation of a Disciplinary Rule. DR 2-107, then as now, provided that a lawyer may not divide his fee with another, non-affiliated lawyer unless the client consents after full disclosure of the fee division arrangement. In a suit brought by the referring attorney to enforce an alleged oral fee-splitting agreement, the court declared:

> We hold that the referral fee contract claimed by Fleming is as a matter of law against the public policy expressed in Disciplinary Rule 2-107 that no attorney's fees shall be divided unless the client's consent is obtained after full disclosure. Fleming's claimed referral fee contract *being violative of our public policy is void and unenforceable.* *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146 (1947).

*Fleming* at 119 (emphasis ours).

Like DR 2-107, DR 5-106 requires that the client be *fully informed* before his consent to an agreement is obtained. Although the decision in *Fleming* was also supported on another theory, namely lack of consideration for the alleged contract, we find the reasoning of the *Fleming* court, as quoted above, to be sound. The policy expressed in DR 5-106 is clearly to ensure that people such as the Quinteros do not give up their rights except with full knowledge of the other settlements involved. That policy was violated when Gonzalez did not inform the Quinteros of the matters required by DR 5-106.

■ Courts will not enforce contracts made in contravention of the law or public policy of this State. *See Woolsey v. Panhandle Refining Co.*, 131 Tex. 449, 116 S.W.2d 675 (1938); *Dodd v. Harper*, 670 S.W.2d 646, 650 (Tex.App.—Houston [1st Dist.] 1983, no writ); *cf. Baron v. Mulli-*

*nax, Wells, Mauzy & Baab, Inc.*, 623 S.W.2d 457 (Tex.App.—Texarkana 1981, writ ref'd n.r.e.). We therefore hold that the contract for the release and settlement of the Quinteros' cause of action is void and unenforceable. In so holding, we are well aware that the Court of Criminal Appeals has adopted a different approach to violations of the Code of Professional Responsibility as the Code relates to criminal matters. *See Henrich v. State*, 694 S.W.2d 341 (Tex.Crim.App.1985); *Pannell v. State*, 666 S.W.2d 96 (Tex.Crim.App.1984) (holding that the Disciplinary Rules of the Code of Professional Responsibility "are not laws of the State of Texas" for purposes of statute which excludes the admission of evidence obtained in violation of law). *See also Holt v. State*, 683 S.W.2d 92 (Tex.App. —Austin 1984, no pet.). However, such holding is inapplicable to civil cases where, as a matter of public policy, the ethics of attorneys and their clients must exist on a very high plane. We sustain the Quinteros' first four points of error. The initial judgment of May 27, 1981, should not have been set aside.

Anticipating our decision in this case, appellee Jim Walter Homes raises cross points challenging the initial judgment in the Quinteros' favor.

The initial judgment awarded the Quinteros $28,504.41 for Jim Walter Homes' violations of the Deceptive Trade Practices Act [currently codified at TEX.BUS. & COM. CODE ANN. §§ 17.41—17.808 (Vernon Supp.1986)], $41,252.80 for violations of Chapters Six and Eight of the Consumer Credit Code [TEX.REV.CIV.STAT.ANN. art. 5069 (Vernon 1971 and Vernon Supp. 1986)], $2,500.00 in attorney's fees, and $6,128.44 in prejudgment interest. Jim Walter Homes challenges only the award for prejudgment interest and the award for the Credit Code violations.

■ Jim Walter Homes contends that prejudgment interest is not recoverable because the Quinteros did not request an award of prejudgment interest in its pleadings. A party who seeks interest, as damages and not *eo nomine* via contract or statute, must ask for it specifically or include it in the aggregate amount sought. *J.M. Hollis Construction Co. v. Paul Durham Co.*, 641 S.W.2d 354, 357 (Tex.App.—Corpus Christi 1982, no writ). Neither the contract between the parties nor the DTPA nor the Credit Code provide for the award of prejudgment interest. The Quinteros, in their pleadings, do not specifically request that they be awarded prejudgment interest. However, they prayed for general relief, and their claim for damages is open-ended. In such a situation and where, as here, there has been no special exception, prejudgment interest is recoverable. *See Laredo Hides Co. v. H & H Meat Products Co.*, 513 S.W.2d 210, 222 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.).

Jim Walter Homes next contends that the prejudgment interest award was error since it was not ascertainable by the contract of the parties but required extraneous proof.

■ "[W]here damages are established as of a definite time and the amount thereof definitely determinable, interest is recoverable as a matter of right from the date of the injury or loss." *Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80, 95–96 (Tex.1976). Pursuant to Article 5069–8.01 of the Credit Code, the trial court awarded the Quinteros twice the time-price differential charged to them by Jim Walter Homes. The time-price differential was $20,626.40. Since this amount is definitely determinable, the Quinteros are entitled to prejudgment interest. *See Tom Benson Chevrolet, Inc. v. Alvarado*, 636 S.W.2d 815, 824 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.).

■ The award of prejudgment interest for the DTPA recovery was also proper. The contract was breached in September of 1977 when Jim Walter Homes supplied the Quinteros with an inferior product. The jury determined that $9,500.00 in repairs would be necessary to conform the Quinteros' home to the one for which they had contracted. These damages were fixed as of the moment of the breach. Since the

jury determined the cost of repairs necessary due to the breach as of the date of the breach, interest on those damages until the date of judgment is recoverable. *See First National Bank v. Shockley*, 663 S.W.2d 685 (Tex.App.—Corpus Christi 1983, no writ); *Rotello v. Ring Around Products, Inc.*, 614 S.W.2d 455 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.). *But cf. Tom Benson Chevrolet, Inc. v. Alvarado*, 636 S.W.2d 815 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.).

The Supreme Court has recently discussed prejudgment interest in the context of personal injury suits in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (1985). The Court's broad language, however, indicates that prejudgment interest awards are proper whenever a plaintiff has suffered a harm, liquidated or not. The *Cavnar* Court held:

> The time has come to revise the prejudgment interest rule to make injured parties whole and restore equity and symmetry to this area of the law. We therefore hold that, as a matter of law, a prevailing plaintiff may recover prejudgment interest compounded daily (based on a 365-day year) on damages *that have accrued by the time of judgment.* To the extent that other cases conflict with this holding, they are overruled.

*Id.* at 553–554 (emphasis in original).

We hold that the prejudgment interest awarded by the trial court was proper. No findings of fact or conclusions of law were requested or filed concerning the computation of this amount. Therefore, we will uphold the judgment on any legal theory supported by the evidence. *In re W.E.R.*, 669 S.W.2d 716 (Tex.1984). There is nothing to indicate the trial court's computation of prejudgment interest was erroneous. We overrule appellee's cross-point dealing with prejudgment interest.

Appellee's other ten cross-points deal solely with the Quinteros' recovery under the Consumer Credit Code. Unlike the DTPA claims, the Credit Code claims were tried before the trial court and not before the jury.

It is unclear which section of the Credit Code the trial court found to have been violated by Jim Walter Homes since no findings of fact or conclusions of law were filed concerning this point by the trial court. Appellee therefore raises a cross point for each possible ground of recovery pled by the Quinteros on which the Credit Code part of the judgment was based.

Appellee's first cross point alleges that the trial court erred in granting the Quinteros' judgment for penalties under sections 8.01 and 8.02 of the Credit Code. It is unnecessary to discuss the merits of this point. In *Jim Walter Homes v. Schuenemann*, 668 S.W.2d 324 (Tex.1984), the Supreme Court held that the contract used by Jim Walter Homes in that case violated the Credit Code. The relevant language of the instruments in that case, quoted by the Supreme Court in its opinion, is identical to that used in the Quinteros' contract. It inescapably follows that the instruments signed by the Quinteros violated the Credit Code. Jim Walter Homes' first cross point is overruled.

■ It is not necessary to address the rest of Jim Walter Homes' cross points. Where findings of fact are not properly requested and are not filed concerning a matter raised on appeal, the judgment of the trial court must be affirmed if it can be upheld on any legal theory that is supported by the evidence. *See In re W.E.R.*, 669 S.W.2d 716 (Tex.1984). By overruling Jim Walter Homes' first cross point, and having necessarily held that the judgment is supportable on at least one theory, it is not necessary to address the balance of the cross points. They are not controlling. TEX.R.CIV.P. 451.

We REVERSE the judgment of the trial court and REMAND the cause with instructions to reinstate the initial judgment of May 24, 1981, including the prejudgment interest award, consistent with this opinion.

Before NYE, C.J., and BENAVIDES and DORSEY, JJ.

## OPINION ON MOTION FOR REHEARING

NYE, Chief Justice.

Our original opinion in this cause, 709 S.W.2d 225, ordered the trial court to set aside the post-judgment settlement agreement between the parties and to reinstate its initial judgment in favor of the Quinteros. Jim Walter Homes raises twelve points of error in its motion for rehearing, all involving the same issues raised in its original appellate brief. We believe that only the first two of these points deserve further discussion.

After a jury verdict and judgment had been rendered in their favor, the Quinteros joined an aggregate settlement agreement between Jim Walter Homes and several hundred other clients of their attorney, Hector Gonzalez. Under the terms of the aggregate settlement agreement between Jim Walter and attorney Gonzalez, Jim Walter gave $1.8 million dollars to Gonzalez for him to distribute to his clients once they agreed to settle their claims against Jim Walter. The amount of money the Quinteros were to receive under the settlement was much less than the judgment called for,[1] largely because no one knew of the judgment's existence and because Gonzalez did not inform the Quinteros of the existence and nature of all the other claims and of the participation of each person in the joint settlement, as required by DR–5–106 of the Code of Professional Responsibility.[2] Gonzalez's agent also told the Quinteros that they were to receive more money than anyone else, which was not true.

This Court held in a unanimous opinion that the agreement between the Quinteros and Jim Walter, being based on a violation of DR 5–106, was void and unenforceable. Jim Walter assigns error to that holding in its motion for rehearing.

Jim Walter Homes argues that the *Fleming* case that we relied upon should be limited to its facts; i.e., that only those contracts formed *between attorneys* which violate the Code can be void and unenforceable. *See Fleming v. Campbell,* 537 S.W.2d 118 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). Jim Walter also contends that the misconduct of the Quinteros' attorney (Hector Gonzalez) should be imputed to the Quinteros in order to uphold the settlement agreement.

■ We disagree with both of these arguments. The Code was designed to protect the *clients* of attorneys and the public in general from the intentional wrongdoings and/or mistakes of attorneys. Gonzalez failed to comply with DR 5–106, a rule designed to protect clients by allowing them to make an intelligent, informed decision whether or not to participate in a joint settlement. Gonzalez denied the Quinteros that right. To impute his misconduct to the Quinteros in order to uphold the settlement would totally thwart the express public policy behind the Code of Professional Responsibility, which is to protect clients. The Quinteros, and all clients, are entitled to a vigorous and thorough enforcement of the Code's Disciplinary Rules. This is especially true where lawyers generally are under a cloud of distrust and suspicion, and their public image has never been lower. The time to improve that poor public image is long overdue. It is up to the courts to take the initial step by giving notice that careless and unethical attorneys will not be tolerated. The public's confidence and trust in attorneys can only be regained by thoroughly protecting the public from the consequences of attorneys' violations of the Code of Professional Responsibility.

Nor is Jim Walter Homes the "totally innocent party" which it purports to be. The trial court, in its findings of fact num-

---

1. The first judgment was for $78,385.65, which included attorney's fees for trial; it also released the Quinteros from their installment note debt to Jim Walter Homes. Under the after-judgment settlement, the Quinteros were to receive only $13,687.00.

2. Supreme Court of Texas, Rules Governing the State Bar of Texas art. XII, § 8 (Code of Professional Responsibility) DR 5–106 (1973).

bers 28 and 29, found that Jim Walter reserved the right under the aggregate settlement agreement for its attorneys to review that amount allocated by Gonzalez to every settling plaintiff, and to disapprove of the amount allocated to any one of them. Jim Walter does not challenge these findings. According to paragraph 5 of the contract between Gonzalez and Jim Walter Homes, Jim Walter Homes had the right to reduce the $1.8 million dollar figure or to even *cancel* the contract if 21 or more of Gonzalez's clients refused to settle their claims. Thus, both Jim Walter and Gonzalez had strong incentives to urge Gonzalez's clients to settle. In fact, Jim Walter's attorneys exercised their right of review by making several inquiries into some of the amounts Gonzalez assigned to his clients, which were to be deducted from the $1.8 million dollars.

Although Jim Walter's attorneys knew of the Quinteros' favorable jury verdict and the near-certainty it would be trebled under the old DTPA statute, they did not question the much smaller amount assigned to the Quinteros by Gonzalez as full settlement. They certainly should have. Thus, Jim Walter was not an "innocent" participant in the transaction between Gonzalez and the Quinteros. By retaining a right to review and by exerting an influence in the settlement process between attorney Gonzalez and his clients, Jim Walter became an active participant in the settlement process. Since the Quinteros' consent to join the settlement was acquired only through a violation of DR 5–107 and through a misrepresentation by Gonzalez's agent, Jim Walter, like Gonzalez, is estopped from enforcing the settlement agreement against the Quinteros.

The Quinteros brought suit in 1978. Almost eight years later, Jim Walter Homes has them tied up in the courts to attempt to deny them their just recovery. Yet, Jim Walter's attorneys testified that it really did not make a difference, under the terms of the aggregate settlement, to whom, or how, the $1.8 million dollars were distributed. A "slush fund" of nearly $100,000

existed which was to be used to provide extra payments to Gonzalez's clients where necessary. That "slush fund" easily would have covered the amount of the Quinteros' rightful judgment, at least for all but the forfeited note's amount. Even if this fund proved inadequate, Jim Walter Homes, by choosing not to protect the Quinteros by ensuring them a fair amount in the $1.8 million dollar settlement, should be required to seek the difference from Gonzalez rather than force the Quinteros to bring a separate lawsuit against Gonzalez. We overrule Jim Walter's first point of error on rehearing.

Our original opinion also holds that the trial court's initial judgment properly awarded the Quinteros $41,252.80 for Credit Code violations by Jim Walter Homes. We relied on *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324 (Tex.1984). Jim Walter Homes contends in its second point of error that *Schuenemann* is distinguishable. We disagree with this argument also.

As in the instant case, three instruments comprised the agreement between the Schuenemanns and Jim Walter Homes: a building contract, and installment note, and a lien contract. In *Schuenemann*, 668 S.W.2d at 329, the Supreme Court held that these latter two instruments violated the Credit Code. Since the relevant portions of the installment note and lien contract in the instant case are *identical* with those in *Schuenemann*, they obviously also violate the Credit Code.

Jim Walter Homes argued in *Schuenemann* that a clause in the building contract prevented the installment note and lien contract from being violative of the Credit Code. Jim Walter Homes raises a similar argument here, involving a different clause. Although the Supreme Court in *Schuenemann* did discuss language in the building contract, the Court rejected Jim Walter Homes' argument. The Court held:

Although at the outset we construed all three instruments together to determine the *entire agreement* between the parties, we conclude that for the limited

purpose of determining the terms of acceleration for which the parties contracted, the clear terms of the acceleration provisions in the installment note and lien contract should be interpreted without reference to the description thereof contained in the building contract. *Schuenemann,* 668 S.W.2d at 330 (emphasis in original). We do not look to the Quinteros' installment contract to save the illegal provisions in the installment note and lien contract. "The court cannot depart from the expressed terms of the acceleration clauses contained in the installment note and lien contract to make lawful what the parties have made unlawful." *Id.* at 332.

■ Jim Walter Homes also alleges that the Quinteros did not plead a cause of action under Sections 8.01 and 8.02 of the Credit Code, and that the granting of relief not pleaded or requested is improper. Paragraph V of the Quinteros' "First Amended Petition" states "Chapter VIII of the Texas Consumer Credit Code provides for a penalty for violating the Code in an amount of twice the time price differential in default and deferment charges contracted for." TEX.R.CIV.P. 47(a) provides that a petition must contain "a short statement of the cause of action sufficient to give fair notice of the claim involved...." We hold that the Quinteros' petition adequately apprised Jim Walter Homes of the Quinteros' claims against them under Chapter Eight of the Credit Code.

Jim Walter Homes' Motion for Rehearing is overruled.

BENAVIDES, J., dissents.

BENAVIDES, Justice, dissenting.

In our opinion delivered December 31, 1985, we reversed a trial court judgment that found in favor of appellee by setting aside an initial judgment for the appellants against the appellee and by entering a take-nothing judgment in favor of appellee. The trial court's take-nothing judgment was based on a settlement and release between the parties. The facts have been previously set out in our original opinion

delivered December 31, 1985. The appellee has timely filed his motion for rehearing, asserting that we erred in reversing the trial court and reinstating the original judgment against the appellee on the basis set forth in our opinion holding that the compromise settlement release was rendered void and unenforceable by the violation of Disciplinary Rule 5–106. Supreme Court of Texas, Rules Governing The State Bar of Texas art. X, § 9 (Code of Professional Responsibility) DR 5–106 (1984). I now believe that I was mistaken and would find that we erred in reversing the trial court. The violation formed the only basis for our December 31, 1985, opinion reversing the trial court.

In finding that the rule made the settlement unenforceable, we relied heavily on *Fleming v. Campbell,* 537 S.W.2d 118 (Tex. Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.), and found the reasoning "to be sound." I agree that *Fleming* was correctly decided, but I find *Fleming* is neither controlling nor related to the main issue in the appeal before us, because the following circumstances existed in *Fleming,* but not in this case:

1. The wrongdoer or attorney violating the Code of Professional Responsibility (DR–107) was the litigant.

2. The wrongdoer sought relief for himself.

3. The wrongdoer (plaintiff in *Fleming*) sought relief for himself from another attorney (defendant in *Fleming*).

4. A violation of DR–107 was held to violate public policy against a member of the group of professionals that it was intended to regulate, and not against an innocent non-attorney litigant.

In the appeal before us, the original jury verdict in favor of the appellants had been received and judgment entered when the compromise settlement agreement was made. The release was executed by the appellants; the attorney for appellants received a check as trustee for appellants; a check for part of appellants' bank payment pursuant to the release agreement was de-

livered; the settlement check was sent to appellants by their attorney. All of this occurred before appellants renounced the authority of their attorney, and is reflected further in the trial court's Findings of Fact and Conclusions of Law. [The release covered all matters known or unknown, and appellants were aware of the jury verdict, although not directly aware of the entry of judgment.]

The settlement agreement was not illegal or invalid on its face, and there is no finding or assertion that appellee was aware of the DR 5–106 violation on the part of appellants' attorney, Gonzalez. I do not believe public policy considerations should extend to holding the settlement agreement void against the appellee under such circumstances. Neither appellee nor his attorney violated DR 5–106. Neither appellee nor his attorney participated in, encouraged, or knew of the wrongdoing or violation by appellant's attorney. Our original decision is even more onerous on the appellee because the same rules formulated to regulate attorneys provide that his own attorney cannot communicate with the other litigant except through (in this case) the appellants' wrongdoing attorney, so that appellee could not have discovered the violation.

In the case of *Lewis v. Davis,* 145 Tex. 468, 199 S.W.2d 146 (1947), cited in *Fleming* and contained in the quotation from *Fleming* in our original opinion, one of the parties (both non-lawyers) sought to avoid a partnership contract as it pertained to certain acquired interests because neither of the parties were registered or licensed dealers under the Texas Securities Act at the time of the making of the agreement. The parties were not shown to have entered into the contract for an illegal purpose. There was no assertion that the parties sought to do anything illegal, or that the parties sought to sell or become dealers in securities without registering under the law when they entered into the contract, and the court therefore held that enforcement of the contract under such conditions would not be against public policy or be rendered unenforceable. *Davis*

sets out general rules relating to public policy considerations vis-a-vis illegal transactions and parties affected by such cases. In its opinion, the Supreme Court stated the following:

> ... When two constructions of a contract are possible, preference will be given to that which does not result in violation of law. *Great Northern R. Co. v. Delmar Co.,* 283 U.S. 686, 51 S.Ct. 579, 75 L.Ed. 1349; 12 Am.Jur. pp. 793, 794, Sec. 251. See also *Texas Employers' Ins. Ass'n v. Tabor,* Tex.Com.App., 283 S.W. 779. A contract that could have been performed in a legal manner will not be declared void because it may have been performed in an illegal manner. *Labbe v. Corbett,* 69 Tex. 503, 6 S.W. 808; 12 Am.Jur. p. 647, Sec. 153. According to the foregoing settled rules, the contract by which the parties associated themselves together, as alleged in the petition, must be held valid and not illegal.

*Lewis,* 199 S.W.2d at 149. While *Lewis* does not specifically control the appeal before us, it is interesting to note that the Supreme Court reviewed the Securities Act and its purpose in its analysis. Likewise, my review of the Code of Professional Responsibility leads me to conclude that DR 5–106 was not intended to regulate the litigants but the attorneys, and I do not find its violation in this case even suggests a public policy consideration against a non-wrongdoing, non-lawyer litigant.

Even assuming that there might be some furtherance of public policy in our original decision holding the settlement void, I would hold that it does not outweigh the established rule that the misconduct of one attorney will not vitiate a settlement agreement so that a litigant is not bound by the agreement. *Texas Employers Insurance Ass'n v. Wermske,* 162 Tex. 540, 349 S.W.2d 90 (1961). "The general rule is that the relationship of attorney and client is one of agency. Under this rule, the omissions, as well as the commissions, of an attorney are to be regarded as the acts of the client whom he represents; and his neglect is equivalent to the neglect of the

client himself." *Wermske*, 349 S.W.2d at 93.

In *Martin v. Trevino*, 578 S.W.2d 763 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.), our Court rejected a claim from a physician against defendant (physician's patient) and the defendant's attorney. The thrust of that opinion as to the physician's claim against the attorney based on the patient's attorney's alleged violation of his professional responsibility was that the attorney is not liable to the adverse party's claim for his actions on behalf of his client, and we held that in such a case the remedy for the violation of the attorney's professional responsibility was public, not private. *Martin v. Trevino*, 578 S.W.2d at 770. While I admit that this blanket assertion would not bar all private actions against an attorney for professional responsibility violations as suggested in appellee's motion for rehearing, I certainly would agree that if a non-lawyer litigant cannot sue his adversary's attorney for a breach of professional responsibility performed in the service of the adversary (because such remedy would be public and not private), that under the circumstances here, the non-wrongdoing litigant should not lose his otherwise lawful settlement because of his adversary's attorney's violation. The suggestion by the majority on rehearing that appellee might seek, in a separate action against Gonzalez, the difference between the settlement and judgment amounts, flies in the face of our holding in *Martin*. Moreover, I fail to appreciate why appellee should be the one to bring suit against Gonzalez for a violation of DR 5–106, rather than appellant, who chose Gonzalez and whose best interest Gonzalez had a duty to protect.

I do not feel that the violation involved herein gives rise to appellants' private to be relieved from their contract because the violation was performed by their own agent. DR 5–106 was not intended to regulate the behavior of an attorney as to his client's adversary or to create a private right or remedy against the non-wrongdoing litigant in favor of the litigant whose own attorney violated DR 5–106. Considerations of public policy do not require that the violation that was complained of herein create a remedy to defeat an innocent wrongdoer from an adversary's wrongdoing attorney.

Estoppel was not before this Court and should not form a basis for the result as found by the majority on rehearing. Notwithstanding, I disagree that appellee was estopped to enforce the settlement agreement. The "review condition" in the settlement agreement, does not rise to a level that creates a violation of the DR 5–106 by the appellee's attorney. The review condition was not even exercised with respect to appellant's individual settlement.

Settlements should be encouraged and not impeded, and voluntary settlements are favored as being in the interest of the law. *State v. Cook*, 407 S.W.2d 876 (Tex.Civ. App.—Waco 1966, writ ref'd n.r.e.). The settlement offer became binding when it was accepted. *Fail v. Lee*, 535 S.W.2d 203 (Tex.Civ.App.—Fort Worth 1976, no writ). The favored status of voluntary settlements, especially with the trend toward multi-party litigation in an ever growing litigious society, should dictate against the extension of the law to create a private remedy against an innocent litigant in favor of the litigant who hired the wrongdoing attorney. I believe our original holding would tend to thwart the public policy in favor of voluntary settlements and would have a chilling effect on the settlement of lawsuits.

I would grant the motion for rehearing and affirm the decision of the trial court.