**ALLIED BANK WEST LOOP, N.A., Appellant,**

v.

**C.B.D. & ASSOCIATES, INC., et al., Appellees.**

No. 01–85–0923–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 12, 1987.

Rehearing Denied March 26, 1987.

Louis H. Salinas, Jr., Karen Beasley Lukin, Robert M. Hardy, Jr., Butler & Binion, Houston, for appellant.

J. Mark Breeding, Ronald E. Hood, Sears & Burns, Houston, for appellees.

Before SAM BASS, COHEN and DUNN, JJ.

## OPINION

COHEN, Justice.

C.B.D. sued Allied alleging negligence, conversion, and breach of contract arising from Allied's treatment of C.B.D.'s accounts. Specifically, C.B.D. alleged that Allied negligently put restricted funds into C.B.D.'s "escrow" account, without inform-

ing it of the restriction, and then corrected that error by withdrawing other funds from the account, even though Allied knew that the money was held by C.B.D. in trust for others. C.B.D. alleged that the withdrawal resulted in a conversion by Allied of funds held in trust for two of C.B.D.'s clients, James Roeder, d/b/a American International Steel Company, hereafter A.I.S., and Drilling Structures, Inc., hereafter D.S.I., both of whom intervened as equitable owners of the funds in the account. The jury found for C.B.D. on all its causes of action, and awarded $267,000 actual and $550,000 punitive damages. The jury also found Allied liable to D.S.I. for $100,693 and to A.I.S. for $151,624. Allied appeals only from the judgment in favor of C.B.D.

C.B.D. was created by its president, Carol DeGeorge, as a personnel agency serving the oil and gas industry. Through the agency, DeGeorge met many oil field equipment buyers and sellers, and during late 1980 and early 1981, she began working as an oil field equipment broker.

In March of 1980, C.B.D. opened a general corporate checking account at Allied. The officer in charge of the account was Mildred Walters. In February of 1981, DeGeorge talked to Walters about her new venture in equipment brokerage. She explained that C.B.D. would be receiving large deposits of customers' money, which C.B.D. would not own. She consulted Walters regarding the type of account that should be used to enable C.B.D.'s buyers and sellers to verify deposits. C.B.D. conducted its first three transactions through its general account. Further discussions between DeGeorge and Walters resulted in C.B.D. opening a second account, styled "C.B.D. & Associates, Inc.—Escrow Account," on March 1, 1981. The written agreement and signature card were for a general corporate checking account. It was the transactions in this "escrow account" that led to this lawsuit.

In mid-March 1981, Constructors Exchange agreed to sell and D.S.I. agreed to buy two two-hundred ton swivels, with C.B.D. being the broker. On March 26, 1981, Allied received a wire transfer of $64,000 from D.S.I. instructing it to create a cashier's check payable jointly to C.B.D. and Phillip Rivera, president of D.S.I. Allied told DeGeorge that the funds had arrived, and, without informing her that the funds were jointly payable to Rivera, deposited the funds to C.B.D.'s escrow account. On March 27, 1981, C.B.D. wired $51,000 from the escrow account to Constructors Exchange for payment of the swivels and kept $13,000 in the escrow account as its commission. Prior to the transfer, DeGeorge had asked Walters to confirm with Rivera that she was sending the funds to Constructors Exchange. Walters never contacted Rivera.

During the first week of April 1981, C.B.D. agreed to broker the sale of 50,000 feet of pipe by Alamo Pipe Company to A.I.S. On Friday, April 10, 1981, A.I.S. wired $143,250 to C.B.D., as a 10 percent deposit on the contract. The wire was addressed to "Allied Bank-Texas," a different entity than the appellant, Allied Bank West Loop.

By this time, D.S.I. had received the swivels and was dissatisfied. Rivera contacted his banker, Tom Suoy, and asked him to recall the $64,000 wire transfer. Suoy called Walters the afternoon of April 13, 1981, and told her that he, as agent for D.S.I., was recalling the wire. Walters then discovered Allied's error in depositing the $64,000 to C.B.D.'s account without Rivera's endorsement.

On the afternoon of April 13, 1981, Walters met with Allied's president, Wayne Lapham, to discuss the problem. Walters testified that they decided to take possession of $64,000 from C.B.D.'s escrow account. The transaction debiting C.B.D.'s account for $64,000 was made on the morning of April 14, 1981. The record reflects that before Allied debited the account, the account contained $10,739.50. The debit created a temporary overdraft that was covered several hours later by the A.I.S. wire of $143,250.

On the morning of April 14, 1981, DeGeorge called Carol Sligar, the clerk in Allied's wire room, to see if the wire from A.I.S. had arrived. Sligar said that she

would find out. At 11 a.m., DeGeorge called Sligar again and was tersely informed that Sligar would call her back if she heard anything. DeGeorge then contacted Allied Bank of Texas, who told her to call Sligar back, because they had already told Sligar that the wire had arrived.

The wire from A.I.S. was received by Allied Bank of Texas at 9:39 a.m. on April 13, 1981, and by Allied Bank West Loop at 11:20 a.m. on April 14, 1981. Handwritten notes made by Walters on the afternoon of April 13, 1981, show "143,250," the exact amount of the A.I.S. wire, although Walters testified that she did not learn of the A.I.S. wire until the afternoon of April 14, 1981. C.B.D. was not informed that Allied had debited the account for $64,000. On April 14, 1981, Allied created a cashier's check for $64,000 payable jointly to C.B.D. and Rivera, and refused to release the money without the endorsements of both C.B.D. and Rivera.

After the close of business on April 14, 1981, James Roeder, owner of A.I.S., called DeGeorge and told her that because of the delay, the pipe contract was canceled and that he wanted his $143,250 returned. Roeder learned from Walters that there were not sufficient funds in C.B.D.'s account to return his money. This was because Allied had taken $64,000 from funds in C.B.D.'s escrow account, including A.I.S.' money, to repay itself for its error in paying Rivera's $64,000 check. On the morning of April 15, 1981, DeGeorge and her attorney told Walters and Lapham that the A.I.S. wire was held by C.B.D. as a deposit in trust for A.I.S.. They demanded return of the $64,000, and Allied refused.

Shortly thereafter, C.B.D. closed its account at Allied. $79,250 was wired to A.I.S. ($143,250 less $64,000) and $10,739.50 was retained by C.B.D. Roeder contacted the F.B.I., which began an investigation. DeGeorge testified that C.B.D. was no longer able to act as a broker, because its reputation was ruined by these events. Unable to generate revenues, C.B.D. had its office furniture, equipment, and art

seized by its landlord for failure to pay rent. C.B.D. conducted no other transactions and ultimately went out of business.

■ The first two points of error contend that there is no evidence or insufficient evidence to support the award of actual damages for lost net profits ($200,000), lost office furnishings ($17,000), and lost commission on the A.I.S. sale ($50,000). Initially, Allied contends that the jury's award of $50,000 to C.B.D. for lost commissions from the lost sale to A.I.S. is not supported by the evidence, because the delay of the $143,250 wire transfer was not caused by Allied, but by the fact that the wire transfer bore an incorrect address, which caused it to be routed to Allied Bank of Texas in downtown Houston, rather than to Allied Bank West Loop.

C.B.D. contends that the 26 hour delay in transferring the funds between Allied Bank of Texas in downtown Houston and Allied Bank West Loop was intentionally caused by Allied West Loop officers, in order to give them time to decide how to cover their mistakes and to slow the movement of funds in order to assure that $64,000 would still be in the account, if and when they decided to seize it.

It is undisputed that when Roeder canceled the contract late in the afternoon of April 14, neither he nor DeGeorge knew of the bank's $64,000 withdrawal. Therefore, the *withdrawal*, no matter how improper or malicious, could not have caused the cancellation of the sale and the consequent loss of the $50,000 commission by C.B.D.

While there was a fact issue as to the cause of the delay in Allied West Loop's receipt of the wire, the jury was not asked whether Allied caused that delay, or whether the delay proximately caused the loss of the commission. The jury found that Allied's negligence in six specific respects proximately caused C.B.D.'s damage, but all six instances pertained to the handling of the $64,000 deposit from D.S.I. and its withdrawal, and none to the handling of the A.I.S. wire transfer of $143,250.[1]

---

1. Special issue 9 inquired: Do you find from a preponderance of the evidence that the Defend-

ant Allied Bank West Loop was negligent in any of the following events?

It is well established that failure to submit a ground of recovery to the jury waives any right of recovery on that ground. *Pickens v. Harrison,* 151 Tex. 562, 252 S.W.2d 575, 582 (1952). Accordingly, it was error to award C.B.D. $50,000 for lost commission on the A.I.S. sale, absent a jury finding that Allied intentionally or negligently delayed the arrival of the $143,250 wire from A.I.S. and that the delay proximately caused C.B.D.'s damages. This portion of the point of error is sustained.

■ Allied next contends that the jury's award of $17,000 for loss of furniture, equipment, and art is not supported by the evidence. The jury found that Allied was negligent in its handling of the $64,000 transaction and converted those funds. There is ample evidence that C.B.D.'s inability to return the $64,000 to A.I.S. injured its reputation as a broker and that C.B.D. conducted no transactions thereafter. The evidence showed that in the brokerage business, a company's reputation is vitally important. Based on such evidence, it was within the province of the jury to find that Allied's actions caused C.B.D. to go out of business and to suffer the $17,000 loss. Accordingly, this portion of Allied's first and second points of error are overruled.

Allied's third and fourth points of error contend that there is no evidence or factually insufficient evidence to support the jury's finding of $200,000 in lost profits to C.B.D. It is undisputed that C.B.D. earned commissions of $1,126.50, $2,053.00, $2,250.00, $132.00, and $2,700.00, totaling $6,661.50, and that C.B.D.'s operating expenses were $2,500.00 per month.

■ DeGeorge testified that C.B.D. earned a $13,000 commission from the swivel sale to D.S.I. On cross-examination, she testified that if the swivels were not what D.S.I. had ordered, then she was not entitled to a commission. It was within the province of the jury to determine, for the purpose of fixing lost profits, whether C.B.D. was entitled to a commission on the sale. Indeed, in the suit between C.B.D. and D.S.I., the jury refused to find that C.B.D. had breached its contract with D.S.I. Thus, the jury was entitled to find that C.B.D. had earned the $13,000.00 commission on the sale to D.S.I. and had lost it only because of Allied's conduct.

■ Additionally, the jury could have considered C.B.D.'s loss of a $50,000 commission from the pipe sale to A.I.S. This loss, although not directly recoverable, is relevant and probative in reviewing evidence of C.B.D.'s lost profits.

Therefore, C.B.D.'s net profits for the two-month period from mid-February 1981 until mid-April 1981 could have ranged from $1,661.50 ($6,661.50 less $5,000.00 expenses) to $64,661.50 ($6,661.50 + $13,000.00 + $50,000.00 less $5,000.00 expenses).

DeGeorge testified that C.B.D. could have continued to earn the same level of profits through the end of 1982. Roeder testified that the oil industry began its decline at the beginning of 1982. Assuming that C.B.D.'s profits continued through the end of 1982, a period of approximately 20 months, lost profits could have ranged from $33,000.00 to over $600,000.00. If the jury had completely disregarded C.B.D.'s claimed loss of the $50,000 commission, the other projected lost profits would have totaled $146,615.00 ($6,661.50 + $13,000 − $5,000 expenses = $14,661.50 net profit for 2 months × 10 [2 month periods].)

■ In order to recover lost profits, a party must show either a history of profita-

(a) By failing to notify C.B.D. & Associates, Inc., that the $64,000.00 wire transfer from Drilling Structures, Inc. was only payable jointly to C.B.D. & Associates, Inc. and Phillip Rivera;
(b) By failing to follow Drilling Structures, Inc.'s instructions that the $64,000.00 wire transfer was to be made payable only to C.B.D. & Associates, Inc. and Phillip Rivera jointly;
(c) By depositing the $64,000.00 wire transfer from Drilling Structures, Inc. in "C.B.D. & Associates, Inc.—Escrow Account" No. 031-161;

(d) By withdrawing $64,000.00 from "C.B.D. & Associates—Escrow Account" No. 031-161 and placing it in a cashier's check payable to C.B.D. & Associates, Inc., and Phillip Rivera;
(e) By failing to notify C.B.D. & Associates, Inc., of the bank's intention to withdraw $64,000.00 from "C.B.D. & Associates, Inc.—Escrow Account" No. 031-161; or
(f) By failing to return $64,000.00 to C.B.D. & Associates, Inc., when demand was made.
The jury answered "yes" to all questions.

bility or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty. *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097 (1938). Without objective facts, figures, and data from historical profitability, or evidence establishing the existence of future contracts, damages for lost profits are mere speculation. *Automark of Texas v. Discount Trophies*, 681 S.W.2d 828, 830 (Tex.App.—Dallas 1984, no writ).

■ The testimony established a fact question regarding lost profits. Although C.B.D. was new to the oil field equipment brokerage business, the evidence established that it had attracted two or three commissioned salespeople, had substantial industry contacts, and, prior to its inability to return D.S.I.'s money, had enjoyed a good reputation. C.B.D.'s financial history, although short, showed profitability and growth.

We hold that the evidence is factually sufficient to sustain the jury's award and is not so speculative as to be unrecoverable as a matter of law. *Harper Building Systems v. Upjohn Co.*, 564 S.W.2d 123, 126 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.); *Barbier v. Barry*, 345 S.W.2d 557 (Tex.Civ.App.—Dallas 1961, no writ).

The third and fourth points of error are overruled.

■ Allied's fifth point of error contends that the trial court erred in refusing to submit an instruction on "new and independent cause." A "new and independent cause" is a separate or independent act that destroys the causal connection between the defendant's negligence and the plaintiff's injury, thereby becoming the immediate cause of such injury. *Young v. Massey*, 128 Tex. 638, 101 S.W.2d 809 (1937). There must be some evidence that the independent act, rather than the defendant's negligence, was responsible for the plaintiff's injury. *Goldstein Hat Manufacturing Co. v. Cowen*, 136 S.W.2d 867, 873 (Tex.Civ.App.—Dallas 1939, writ dism'd). It is not error for the trial court to refuse a "new and independent cause" instruction where the act alleged to be a

new and independent cause is dependent on the defendant's negligent act. *McAllen Kentucky Fried Chicken No. 1 v. Leal*, 627 S.W.2d 480, 483 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.).

Allied contends that the sole reason for C.B.D.'s loss of the A.I.S. transaction was the delay of the wired funds occasioned by the wire's incorrect address. It thus appears that the instruction was only relevant to determine whether Allied's acts caused the lost commission on the sale to A.I.S. Because we have held that C.B.D. may not recover damages for a lost commission on the sale to A.I.S., the new and independent cause argument is moot.

■ Moreover, some of Allied's acts of conversion and negligence, such as the failure to return $64,000 to C.B.D. upon demand on April 15, 1981, occurred after the A.I.S. wire was received by Allied West Loop. As such, the mislabeling of the wire transfer was at most a concurrent cause, not a new and independent cause, which does not relieve Allied of liability or justify submission of its requested charge. *Bell v. Campbell*, 434 S.W.2d 117, 121 (Tex.1968).

■ Next, Allied contends that C.B.D.'s loss was the result of D.S.I.'s failure to pay C.B.D. the $64,000 for the swivels. We disagree. While there is no evidence to support any damages to C.B.D. based *only* on Allied's error in depositing the D.S.I. transfer into C.B.D.'s account, there is substantial evidence supporting the jury's finding that C.B.D. was harmed by Allied's action in reversing the $64,000 entry. Allied would disregard its admitted error in depositing the funds in C.B.D.'s account and the subsequent reversing entry, and consider only D.S.I.'s ultimate decision not to pay C.B.D. from the funds contained in the $64,000 cashier's check. Allied fails to recognize that, but for its original negligence in depositing restricted funds in C.B.D.'s account without telling C.B.D. of the restriction, C.B.D. would not have had sufficient funds to transfer $51,000 to Constructors Exchange in payment of the swivels, nor would it have been misled into thinking that it had authority to do so.

D.S.I.'s decision not to endorse the cashier's check was, at most, a concurrent cause, not a new and independent cause. *Id.* The trial court did not abuse its discretion in refusing to submit the requested charge. *Durbin v. American Manufacturing Co.,* 643 S.W.2d 239 (Tex.App.—El Paso 1982, writ ref'd n.r.e.); Tex.R.Civ.P. 277. The fifth point of error is overruled.

■ The eighth point of error contends that the jury's answers to special issues 14 and 15 irreconcilably conflict with the jury's answer to special issue 16. In issues 14 and 15, the jury found: (1) that D.S.I. failed to return the swivels immediately after finding them unsatisfactory; (2) that D.S.I. delivered the swivels to third parties without first ascertaining whether the third parties could pay for them; and (3) that these acts constituted negligence and proximately caused "damages" to C.B.D.

Special issue 16 inquired as follows:

If you have answered any subpart of each of Special Issues Nos. 10, 13, and 15 "Yes," and only in the event [2], then answer the following Special Issue No. 16; otherwise, do not answer the following Special Issue.

What percentage of negligence that caused the *losses in question* do you find from a preponderance of the evidence to be attributable to each of the entities found by you to have been negligent? The percentage of negligence attributable to an entity is not necessarily measured by the number of acts or omissions found.

| | |
|---|---|
| C.B.D. & Associates, Inc. | % |
| Drilling Structures Inc. | % |

| | |
|---|---|
| Allied Bank West Loop, N.A. | 100% |
| | 100% |

(Emphasis added.)

Allied argues that it could not be 100% responsible for C.B.D.'s "losses" if D.S.I.'s conduct also caused "damages" to C.B.D.

If answers to material jury issues are in irreconcilable conflict, a judgment based on such a verdict is fundamentally erroneous and must be reversed. *Little Rock Furniture Manufacturing Co. v. Dunn,* 148 Tex. 197, 222 S.W.2d 985 (1949); *Pollard Friendly Ford Co. v. Johnson,* 487 S.W.2d 829 (Tex.Civ.App.—Amarillo 1972, no writ). However, it is presumed that the jurors did not intend their answers to conflict, and it is the court's duty to harmonize the jury's findings, if possible. *Huber v. Ryan,* 627 S.W.2d 145 (Tex.1981).

The jury could have reasonably concluded that D.S.I. was negligent and caused "damages" to C.B.D., but could have also found that Allied's negligence was solely responsible for the "losses in question," i.e., the specific elements of actual damages that were listed in special issue 24 (lost commissions, lost furniture, equipment, and art, and lost profits.) [3] This is so because special issue 16 inquired specifically as to "the losses in question," while special issue 15 inquired only as to general "damages." Special issue 16 is the more specific finding, and in order to reconcile the apparent conflict, we hold that "losses in question," mentioned in special issue 16, refers to the specific elements of damages contained in issue 24. In other words, the "losses in question" may have been viewed by the jury as meaning the "losses" in "question" 24, where the word "loss" or "lost" are repeatedly used to describe specific elements of damages. The jury was

---

**2.** Issue 13 was not answered, and issue 10 found that Allied's negligence proximately caused "damages" to C.B.D. Thus, both are irrelevant to our disposition of this point of error because neither answer favored Allied.

**3.** Special issue 24 inquired:

What sum of money paid now in cash, if any, do you find from a preponderance of the evidence would fairly and reasonably compensate C.B.D. & Associates, Inc., for its damages, if any, resulting from the occurrences in question?

In your determination of the above Special Issue, you shall only consider loss of commission from the $1,438,250.00 contract with James Roeder, loss of furniture, office equipment and art from the offices of C.B.D. & Associates, Inc., and loss of net profits established with reasonable certainty.

ANSWER IN DOLLARS AND CENTS, if any. ANSWERS:

| | |
|---|---|
| (a) loss of commission: | $ 50,000 |
| (b) loss of furniture, equipment and art: | $ 17,000 |
| (c) lost net profits: | $200,000 |

not required, in answering special issue 16, to relate it to the general, undefined "damages" that were mentioned in issues 10 and 15. If Allied desired that issue 16 be answered solely in relation to special issue 10 and 15, it could have framed issue 16 to ask:

> What percentage of negligence that caused the losses *in questions 10 and 15* do you find from a preponderance of the evidence to be attributable to each of the entities found by you to have been negligent?

In the absence of such an inquiry, we adhere to the rule that disregards apparent conflicts by holding that a specific finding dominates a finding that is so general as to constitute a legal conclusion. *Sproles v. Rosen,* 126 Tex. 51, 84 S.W.2d 1001 (1935); *Woodyard v. Hunt,* 695 S.W.2d 730, 733–34 (Houston—[1st Dist.] 1985, no writ); *Lewis v. Yaggi,* 584 S.W.2d 487 (Tex.Civ.App.— Tyler 1979, writ ref'd n.r.e.); *Tennessee Gas Pipeline Co. v. Hartman,* 556 S.W.2d 616 (Tex.Civ.App.—Corpus Christi 1977, no writ); *Ingles v. Cohen,* 543 S.W.2d 455 (Tex.Civ.App.—Waco 1976, writ ref'd n.r. e.); 3R. McDonald, *Texas Civil Practice in District & County Courts* sec. 15.06.5. (rev.1983).

The eighth point of error is overruled.

Allied's ninth point of error contends that the jury's answers to special issues one and 17 conflict with its answers to issues 12(a) and 12(c). In special issue one, the jury found that:

> [T]he defendant Allied Bank West Loop knew, or in the exercise of reasonable diligence should have known, that the $143,250 wire transfer to "C.B.D. & Associates, Inc.—Escrow Account" No. 031–161 received by said Defendant from James Roeder contained funds of James Roeder to be held in trust by C.B.D. & Associates, Inc.

In special issue 17, the jury found that:

> Allied Bank West Loop agreed with C.B.D. & Associates, Inc., that Account No. 031–161, entitled "C.B.D. & Associates, Inc.—Escrow Account," would be an account in which funds of clients of C.B.D. & Associates, Inc., would be held

in trust by C.B.D. & Associates, Inc., for the benefit of such clients.

In special issue 12(a), the jury found that:

> C.B.D. & Associates, Inc. failed to inform Allied Bank West Loop of the terms, conditions and requirements of its contracts with Drilling Structures, Inc., and American International Steel.

In special issue 12(c), the jury found that:

> C.B.D. & Associates, Inc., called, left messages, or otherwise communicated with Allied Bank West Loop in such a fashion as to lead the bank to believe that C.B.D. & Associates, Inc., had an unrestricted right to the funds transferred by Drilling Structures, Inc., and American International Steel.

The jury found that C.B.D.'s actions in issues 12(a) and 12(c) were not negligence.

The jury's answer to issue 12(a) is immaterial to the jury's findings that Allied knew or should have known of the trust character of the account. It was not necessary for Allied to know of the terms of C.B.D.'s contracts in order to establish that Allied knew or should have known that C.B.D. held funds in the escrow account in trust for its clients.

Issue 12(c) can be harmonized in two ways. First, as trustee of the funds, C.B.D. was the legal owner and had the full right to control and transfer any funds in the account. Thus, as between Allied and C.B.D., C.B.D. did have an unrestricted right to the funds in the account. Second, the jury found in issues nine(a) and ten(a), that Allied failed to notify C.B.D. that the $64,000 transfer was payable jointly to C.B.D. and Rivera. It is not surprising that C.B.D. asserted its right to the unrestricted use of the funds, in view of Allied's failure to inform C.B.D. that the $64,000 transfer was jointly payable to Rivera, a third party. This would also explain the jury's finding that such action by C.B.D. was not negligence. The ninth point of error is overruled.

Allied's 10th and 11th points of error contend that there is no evidence or insufficient evidence to support the submission of issues nine(d), nine(e), and nine(f). Allied

also contends that it owed no legal duty to C.B.D. and that, as a matter of law, it was acting consistent with its legal duties in correcting its error. In points of error 12 and 13, Allied contends that the record contains no evidence of the requisite standard of care applicable to banks engaged in transactions of the nature herein, and therefore, the evidence is legally insufficient to support the finding of its negligence.

 Allied concedes here, as it did in trial, that it erred in depositing the $64,000 into C.B.D.'s account, rather than creating a cashier's check jointly payable to C.B.D. and Rivera, as called for by the wire from D.S.I. Although a bank may reverse an erroneous deposit, even if it creates an overdraft, *Scott v. Highland Park State Bank*, 218 S.W.2d 877 (Tex.Civ.App.—Fort Worth 1949, writ ref'd n.r.e), it may not offset a depositor's debt against funds held by the depositor in trust for another. *Steere v. Stockyards National Bank*, 113 Tex. 387, 256 S.W. 586 (1923). Either actual or constructive notice to a bank of the trust character of funds will trigger the rule espoused in *Steere*. *Pan American National Bank v. Holiday Wines & Spirits, Inc.*, 580 S.W.2d 7, 10 (Tex.Civ.App.— Houston [1st Dist.] 1979, writ ref'd n.r.e.); *see also National Indemnity Co. v. Spring Branch State Bank*, 162 Tex. 521, 524, 348 S.W.2d 528, 531, (1961).

 Allied's error in depositing the $64,000 into C.B.D.'s account created, at best, a general obligation on the part of C.B.D. to the Bank. The jury found that Allied knew or should have known of the trust nature of the account. Two bank officers, Walters and Lapham, testified that a bank had no right to offset a trustee's general obligation against an account containing money held in trust by the trustee for another. Once the jury determined that Allied knew or should have known of the trust nature of the account, it could have reasonably rejected the officers' testimony that their actions were reasonable and customary in the industry. The jury was free to find that Allied had no right to offset the general obligation against a trust account. The 10th, 11th, 12th, and 13th points of error are overruled.

Allied's sixth point of error contends that there is no evidence that it acted with malice towards C.B.D. or with heedless disregard of C.B.D.'s rights in handling either the Roeder or D.S.I. wire transfers. The seventh point of error contends that the evidence is factually insufficient to support the jury's answers to special issues 31, 32, and 34 regarding malice. In issue 31, the jury found, on the conversion cause of action, that the Allied's actions in handling the Roeder transfer, its withdrawal of $64,000 from C.B.D.'s escrow account, and its refusal to unconditionally return the money to C.B.D. were done with malice. In issue 32, the jury found that Allied's negligence was in "heedless and reckless" disregard of C.B.D.'s rights. Issue 34 awarded C.B.D. $550,000 in punitive damages. There is no claim on appeal that the amount of punitive damages is excessive.

 A finding of malice or heedless and reckless disregard of the rights of another requires evidence of ill will, spite, evil motive, or intent to purposely injure. *Clements v. Withers*, 437 S.W.2d 818, 822 (Tex. 1969). Malice should not be lightly inferred, but must be supported by the evidence. *Phillips Chemical Co. v. Hulbert*, 301 F.2d 747, 751 (5th Cir.1962). A jury award of punitive damages will be sustained if the evidence establishes conscious indifference to the rights of others. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983).

 The record reflects that when C.B.D. informed Allied of the effect of its reversing entry and its impropriety, Walters responded, "[w]ell we made a mistake, and that is the way we elected to correct the mistake, and the money is not going back in," and, "[m]aybe we can't, but we did." The record demonstrates, and the jury found, that both Walters and Lapham were familiar with the function of fiduciary accounts and were aware that a general obligation could not be offset against an account containing money held in trust for another. *Steere*, 256 S.W. 586. The jury could have believed that Allied, which it

found knew or should have known of the trust nature of the account, acted with a conscious indifference by correcting its mistake at C.B.D.'s expense.

The sixth and seventh points of error are overruled.

■ Allied's 14th point of error contends that the trial court erred in awarding prejudgment interest at the rate of 10 percent per annum compounded daily. Allied does not contend that prejudgment interest is improper, but contends that the rate should be 6 percent per annum simple interest rather than 10 percent per annum compounded daily, pursuant to Tex.Rev. Civ.Stat.Ann. art. 5069–1.03 (Vernon Supp. 1986).

Article 5069–1.03 expressly provides for 6 percent per annum to "be allowed on all accounts and contracts...." However, 5069–1.03 does not control this case because the judgment rendered was not based on an account or contract. *Missouri-Kansas-Texas Railroad Co. v. Fiberglass Insulators*, 707 S.W.2d 943 (Tex.App. —Houston [1st Dist.] 1986, writ ref'd n.r. e.). Rather, the judgment is based on negligence and conversion.

In *Cavnar v. Quality Control Parking Inc.*, 696 S.W.2d 549, 552 (Tex.1985), the court held that:

[A]s a matter of law, a prevailing plaintiff may recover prejudgment interest compounded daily (based on a 365–day year) on damages that have accrued by the time of judgment. To the extent that other cases conflict with this holding, they are overruled. Prejudgment interest shall accrue at the prevailing rate that exists on the date judgment is rendered according to provisions of Tex.Rev. Civ.Stat.Ann. art. 5069–1.05 § 2 (Vernon Supp.1985).

In *City of Houston v. Wolfe*, 712 S.W.2d 228 (Tex.App.—Houston [14th Dist.] 1986, no writ), the court, following *Cavnar*, allowed daily compounding of prejudgment interest in an eminent domain proceeding. The court found that, "although the *Cavnar* opinion, in its barest terms, merely holds that in personal injury cases prejudgment interest is recoverable as a matter of law, its rationale extends to all types of cases." *Id.*, at 230; *see also Allright, Inc. v. Pearson*, 711 S.W.2d 686 (Tex.App.— Houston [1st Dist.] 1986, writ pending) (allowed prejudgment interest, pursuant to the *Cavnar* formula, for negligence); *McKinney v. Meador*, 695 S.W.2d 812 (Tex. App.—Tyler 1985, writ ref'd n.r.e) (prejudgment interest on damages caused by defendant's negligence); *Quintero v. Jim Walter Homes, Inc.*, 709 S.W.2d 225 (Tex. App.—Corpus Christi 1985, no writ) (allowed prejudgment interest in D.T.P.A. case).

We hold that the trial court correctly followed *Cavnar* by allowing 10 percent prejudgment interest compounded daily.

The 14th point of error is overruled.

■ Allied presents two conditional points of error that contend that the evidence is insufficient to support a recovery for conversion. Because the judgment is supported by C.B.D.'s negligence cause of action, there is no need to address the conditional points of error. Presuming, however, that conversion is necessary to support the judgment, the evidence indicates that the bank did, in fact, convert C.B.D.'s funds. The substance of these points has previously been considered. They are, therefore, overruled.

The judgment is reformed to reduce the award of $267,000 to $217,000, deleting $50,000 for the lost commission. As reformed, the judgment is affirmed.