Anthony AUTHORLEE, Dexter Burnett, Robert Derousselle, John Henry Young, Jerome Stubblefield, and Floyd Moran, Appellants,

v.

TUBOSCOPE VETCO INTERNATION-AL, INC., AMF Incorporated, and Minstar, Inc., Appellees.

No. 01–06–00719–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 28, 2008.

Dissenting Opinion Oct. 2, 2008.

Rehearing Overruled Oct. 7, 2008.

William J. Skepnek, Skepnek, Fagan, Meyer & Davis, P.A., Lawrence, KS, Steven Smoot, Smoot Law Firm, P.C., Frank W. Mitchell, Frank W. Mitchell & Associates, LLP, Houston, for appellants.

Philip T. Bruns, Jeffrey C. Kubin, Laura Hanley Carlock, Gibbs & Bruns, L.L.P., Troy Ray Ford, Andrea Jean Irey Paterson, Beck, Redden & Secrest, L.L.P., Houston, for appellees.

Panel consists of Justices NUCHIA, KEYES, and HIGLEY.

## OPINION

SAM NUCHIA, Justice.

In six issues, appellants, who were settling plaintiffs in the underlying lawsuit,

seek to overturn the trial court's denial of their motion for new trial. Appellants argue here, as they did in the trial court, that their agreed judgment should be set aside as "void as against public policy" because their trial lawyers did not tell them it was an aggregate settlement and because their trial lawyers, along with the appellees, committed fraud.

We affirm.

## BACKGROUND

### History

This is a dispute about the propriety of settlements in a mass tort case. Before the lawsuit at issue in this appeal, appellants' trial attorney, Shelton Smith, had represented other plaintiffs in silicosis cases against appellees, the "AMF defendants," establishing a course of conduct for negotiating and resolving these claims with Daniel Shank, counsel for the AMF defendants. This course of conduct included evaluating the merits of each plaintiff's case based on work history, medical diagnosis and impairment, and other factors that might have impacted the outcome at trial. In those prior 40 lawsuits, Smith had recovered about $40 million in settlements for his clients.

### Initial Settlement Negotiations

Appellants were among 176 plaintiffs who sued Tuboscope Vetco International, Inc., AMF, Inc., and Minstar, Inc., along with other defendants, for injuries they alleged were caused by their occupational exposure to silica while working for AMF Tuboscope in Midland, Texas. In January 1999, appellants' trial attorneys, Shelton Smith and Scott Hooper, approached appellees with vague, initial settlement demands. In one letter, Smith wrote:

I am presently representing 55 former AMF Tuboscope sandblasters who suffer from silicosis or mixed dust pneumo-noconiosis as a result of their employment at Tuboscope. Each of these 55 men has a serious occupational lung disease....

As of this date, I have filed 25 lawsuits against AMF, Inc. The other 30 diagnosed cases are ready to be filed. There may be more....

From January through May, Smith and Hooper had a series of conversations—in person, by telephone, and by mail—with Daniel Shank, counsel for the AMF Defendants. They spoke about factors that would be involved in any settlement. Shank proposed, on behalf of his clients and their insurers, that all of Smith's silicosis claims be settled at one time, using the term "global" in several communications. Shank wrote:

At this point in time, my client and its insurers are not interested in negotiating a settlement in individual cases on a case-by-case basis. Furthermore, my client and its [insurance] carriers are not interested in negotiating a resolution of cases on a subgroup basis. However, my client and its carriers are interested in a global settlement proposal. Accordingly, if you wish to resolve these cases, I would suggest that you proceed with preparing a global settlement proposal.... If the parties seem reasonably in contact with each other, then it may be appropriate for all parties to proceed with a global mediation....

To the extent that my client and its insurers are not able to proceed with a global resolution of these matters, please be advised that my client and its insurers are not interested at this time in negotiating settlements on a piece-meal, case by case or subgroup basis. Rather, they would prefer pursuing a global approach without being distracted by piecemeal or subgroup negotiations.

Shank later testified that he and his clients were interested only in a global resolution to ensure that cases with similar liability and damages would settle for similar amounts. He said, "We were dealing with the strategy where he would hitch his wagon to a highly valued case and then later on we would be fighting about whether or not an apple is an apple or an apple is an orange."

### Preparing for Mediation

The parties agreed to go to mediation in July. Before mediation, Shank suggested that they evaluate the first 21 cases to determine a method for resolving Smith's inventory of claims. Shank suggested this because he had more information on those 21 plaintiffs than on the other plaintiffs: they had deposed the plaintiffs, reviewed their medical records, and obtained "defense IMEs."[1] In addition, Smith sent Shank several boxes full of information about individual plaintiffs, including information on all the appellants. However, only some plaintiffs had complete case evaluations, including diagnosing medical reports and social security records verifying employment at AMF Tuboscope. For example, only summaries but no medical reports were available for Anthony Authorlee.

Smith also contacted his clients before mediation. In a June 30, 1999 letter, Smith told his clients, "There are very important events in July regarding your AMF Tuboscope case." He invited about half of the plaintiffs to a meeting to provide details about the upcoming mediation and stressed the importance of attending the meeting. With the invitation, Smith sent a report with questions and answers

about the status of the litigation. In this report, Smith explained:

We have a mediation scheduled for the second week of July. This is a negotiation session where we will meet with attorneys and insurance representatives for AMF and discuss settlement possibilities for our AMF clients. Your case could potentially be discussed at this three day session.

To prepare for the possibility of discussing your case, we have computerized a large amount of information about you. Some of that information is printed on the Client Information Sheet. *We need you to review that information right now.*

. . .

We know you have questions. But with the AMF mediation a few days away and since we represent more than 300 AMF clients, we simply cannot provide our typical personalized service for the next two weeks. We need to focus all of our attention on preparing for this session with the AMF attorneys.

. . .

NO ONE ELSE EXCEPT YOU AND YOUR SPOUSE MAY ATTEND. THIS WILL BE A MEETING PROTECTED BY ATTORNEY–CLIENT PRIVILEGE, NO FRIENDS OR OTHER PERSONS MAY ATTEND.

. . .

A very detailed overview of the AMF cases will be presented. Shelton Smith is your lead attorney who has successfully pursued cases against AMF for 15 years. He will be reviewing the current situation and will be discussing details of your case. Shelton has settled more than 40 cases against AMF.

---

1. In mass-tort litigation, IMEs, or independent medical evaluations, are not independent in the traditional sense, but rather IME is used as a term of art for a medical examination conducted by a doctor of the defendant's choosing. Usually only one IME is done per plaintiff, with the defendants sharing in the cost and using the same report in litigation.

. . .

Because of space limitations, we are only meeting with about half our clients on July 10. Another meeting or meetings will be held this summer for the rest of our clients. ONLY THOSE CLIENTS WITH AN INVITATION LETTER SHOULD ATTEND THE MEETING.

. . .

Though it is possible that some of these cases could be resolved soon, nothing is certain. Anything could happen. It is possible that a reasonable solution involving your case may not be resolved for months or possibly even years.

. . .

The upcoming mediation will be the first time we have discussed the *possibility* of resolving all of our AMF cases with the AMF lawyers. But there is ABSO-LUTELY NO GUARANTEE THAT ANY PROGRESS WILL BE MADE. We will know more in two weeks.

### Mediation

According to Shank, several plaintiffs as well as representatives of appellees' lead insurance carriers attended the mediation. The attorneys spent the first few days trying to agree on what criteria to use to establish the value of each plaintiff's claim. For example, Smith had a matrix in which he had ranked the relative value of each plaintiff's claim based on factors like: (1) length of exposure to silica while working at the Tuboscope plant, (2) age, (3) marital status, (4) number and age of children, (5) severity of diagnosis and whether the diagnosis was made by a doctor that the AMF

defendants respected, (6) prior drug use, and other factors that may have influenced a jury verdict at trial. On the other hand, appellees had their own matrix, and they wanted to focus on exposure dates, pulmonary function test results, and impairment ratings.

Smith would not agree to appellees' criteria. He later testified that most of his clients were not symptomatic, "[V]ery few of these men ever—ever had a complaint about a pulmonary problem. Very few, very few ever saw a doctor for one or had any kind of treatment." He testified that at least one appellant's case would have been "valueless" had he agreed to appellees' settlement criteria.[2]

Both Smith and Hooper stated that they did not discuss appellants' individual cases during the mediation. Smith testified that they discussed a few cases individually as a means of reality testing the effect of the criteria each side proposed. Smith testified that they did not discuss settling any particular plaintiff's case during the first few days of the mediation. Scott Hooper testified that he was not aware of any individual negotiation for Anthony Authorlee. Smith also said that at least twenty additional plaintiffs were added to the litigation after the mediation.

Shank also testified that he understood that they were discussing not just the 150 or so positively diagnosed plaintiffs and that there would be additional plaintiffs added to the group prior to settlement. He said that there were some offers made during the mediation, "I think there were matrix predicated conditional offers made

2. "Dan's [appellees' attorney] whole deal when he was arguing about this matrix, you know, he wanted—he wanted—he wanted a matrix that was heavily weighted to exposure dates, FVC [forced vital capacity], and impairment rating. And if I would have ever agreed to that, then Dexter—Dexter Burnett's case

would have been basically worthless because he had 115 percent predicted FVC, which, you know, is no impairment, I mean, you know, zero impairment. And if I would have ever agreed to Dan's form of matrix, that case would have been basically valueless."

because obviously we had to get carrier approval ... there were discussions involving numbers and matrixes, and I believe we floated some of those with an actual number...."

Most notably, however, Shank testified that he had no settlement authority at the mediation. He said he could only agree to a framework for settlement, saying, "I was making proposals that I would recommend to my clients...." Shank explained that over the period for which liability may exist for AMF Tuboscope, roughly from 1961 to 1986, when the plants stopped using silica, there were numerous different insurance policies issued to AMF Tuboscope by different carriers. Shank explained that he was not "coverage counsel" for the AMF defendants and that other lawyers were responsible for allocations among the various insurance carriers depending on the facts of a particular case. He testified that before any settlement could be funded, coverage counsel for the AMF defendants would establish where and when the diagnosed individual plaintiff worked and in what job function (*i.e.*, a job that exposed him to silica or not) based on Social Security records and AMF Tuboscope personnel records. Using this information, coverage counsel would allocate responsibility in order to seek coverage from the insurance carriers. Shank said that seven to fifteen separate carriers might be involved in an individual settlement and different layers of insurance may also be involved. Therefore, each settlement had to be done individually.

After several days of fruitless mediation about which factors should be used to val-

ue the plaintiffs' claims, they switched gears and decided to talk about a total amount of money needed to resolve all the claims at one time. Appellees' attorney agreed that so long as the individual demands did not exceed $45 million, he would recommend to his clients and their many insurance carriers to settle the claims, but only if 95% of Smith's clients agreed.[3] They signed a Rule 11 agreement memorializing their understanding, although the Rule 11 agreement did not include the $45 million figure—or *any* sum of money—for settling Smith's inventory of claims.

### Post–Mediation Negotiations and Settlement Agreements

After the mediation, appellants' attorneys recalculated the settlement amounts for each plaintiff, including about twenty plaintiffs who were diagnosed with silicosis after the mediation. Smith then sent each appellant a letter detailing an offer of settlement, based on the numbers he calculated using his matrix. The letters were substantially the same, except for the settlement amounts, which, for the appellants, ranged from $209,000 to $662,000, and which were characterized as a "final offer" made by defendants.[4] All but one or two plaintiffs of the 178 or 179 pending claims agreed to settle.

In early August, each appellant signed an authorization to settle, which specifically acknowledged that each appellant's claim was negotiated with other similar claims but was not part of an aggregate settlement. After each appellant signed the authorization to settle, appellant's attorneys forwarded an individual, formal

---

**3.** Smith testified, "My understanding with Dan [appellees' attorney] was that if all of my clients made individual demands, that when you added them all up totaled in the range of $45 million, that he would then recommend to his carriers and his client that they—that they pay those demands."

**4.** Anthony Authorlee ($488,000), Dexter Burnett ($384,000), Robert Derousselle ($209,000), Floyd Moran ($314,000), Jerome Stubblefield ($384,000), John Young ($662,000).

demand letter to appellees, which appellees could accept or reject. From mid-September through mid-October, appellees accepted all but one demand, at one point asking for additional time to review certain plaintiffs' settlement demands.

In late October, before the settlements actually closed, Hooper wrote to Shank, requesting certain additions and revisions to the Settlement Agreements, including the addition of the following language:

> This Agreement supersedes all previous agreements, written or oral. Plaintiff and Defendants have been involved in lengthy settlement negotiations, involving a variety of settlement offers, and proposals. This agreement reflects the final settlement offer made by the Defendants and accepted by the Plaintiff. Any and all previous settlement offers, by either party, are hereby revoked.

> Defendants' payment of the settlement amounts stated herein are [sic] independent of its agreement to make payments to other plaintiffs in the same or related lawsuits. Plaintiff and Defendants have negotiated this settlement based upon the individual merits of the Plaintiff's claims. Defendants have not made any aggregate settlement offer and this settlement is not part of any aggregate settlement.

> Nothing in this Agreement shall be construed as a release, discharge, settlement or compromise of Plaintiff's right to pursue Workers' Compensation benefits.

> The release, settlement, assignment and indemnity of claims stated in this Agreement do not apply to Plaintiff's claims against [the non-settling defendants].

This language was inserted verbatim, and Shank later testified by affidavit, "This language was drafted by Plaintiffs' attorneys and was inserted into the Settlement Agreements without change at their request. Defendants did not seek to include, draft, or edit this language."

In November, each appellant signed a Settlement, Indemnity and Release agreement and an affidavit that stated each had relied on his lawyer's legal advice. Later that month, the 129th District Court granted the 177 settling plaintiffs' motion to consolidate their cases.[5] In December, the trial court entered an agreed judgment on the settlement.

### Appellants Hire New Counsel

In 2002, four appellants and eleven other settling plaintiffs terminated their attorney-client relationship with Shelton Smith & Associates, engaged Robins, Cloud, Greenwood & Lubel, LLP, and moved to retain and sever their claims, which were set to be dismissed for want of prosecution. The court granted their motion. In 2004, all six appellants sued their trial attorneys, Smith and Hooper, and the appellees, alleging that Smith fraudulently induced them to enter into an impermissible aggregate settlement and that appellees conspired in that process.

### The Motion for New Trial

In May 2006, more than six years after the entry of the agreed judgment in appellants' silicosis cases, the trial court severed appellants' claims, making the agreed judgment final as to them. Appellants then filed a motion for new trial, arguing that: (1) the settlement agreements were void because they violated the aggregate settlement rule in the Texas Rules of Professional Conduct, and therefore, the

---

**5.** They were consolidated in Cause No. 98–03885, *John George Baxter, et al. v. Tuboscope Vetco International, Inc., formerly AMF, Inc.,* *et al.,* in the 80th District Court of Harris County, Texas.

agreed judgment was also void; (2) Tuboscope Vetco, AMF, and Minstar committed actual fraud in connection with the settlements; and/or (3) Tuboscope Vetco, AMF, and Minstar conspired to commit fraud with appellants' trial counsel in connection with the settlements.

### Trial Court Denies Motion for New Trial

Two months later, the trial court[6] denied appellants' motion for new trial. The trial court's order denying the motion for new trial included significant findings of fact and conclusions of law. First, the trial court found that appellants' trial attorney "violated Rule 1.08(f) of the Texas Disciplinary Rules, the 'aggregate settlement rule.'" However, the trial court concluded that such violation did not void the agreed judgment. Next, the trial court concluded that there was no actual fraud committed by appellees because appellants could not prove reliance and because it is "unreasonable for a person to rely on statements of the opposing party in settling litigation."[7] Finally, the trial court concluded that "there can be no conspiracy to commit fraud in the litigation setting."

### Appeal

Appellants challenge the trial court's denial of their motion for new trial with six issues on appeal:

(1) Did the trial court correctly find that there was an aggregate settlement between the AMF defendants and the original six plaintiffs that sued them?

(2) Are undisclosed aggregate settlements void as a matter of public policy?

(3) If undisclosed aggregate settlements are void as a matter of public policy, are they nevertheless enforceable by defendants that enter into them with the knowledge that the Plaintiffs' lawyers have deceived their clients about the character of the settlement?

(4) If undisclosed aggregate settlements are void as a matter of public policy, are they nevertheless enforceable by defendants who collude with Plaintiffs' counsel and allow the Plaintiffs' lawyers to deceive their clients about the character of the settlement?

(5) If undisclosed aggregate settlements are void as a matter of public policy, are they nevertheless enforceable by defendants who knowingly include false representations in settlement agreements prepared by defendants?

(6) Does a defendant have a duty to provide all material information about the true nature of a settlement once he voluntarily includes misleading representations about the nature of the settlement in his settlement papers? If a defendant breaches such a duty and thereafter secures a settlement, should such a settlement and agreed judgment be set aside as a matter of law?

### Motion for New Trial

■■■ We review a trial court's denial of a motion for new trial for abuse of discretion. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex.1983), *overruled on other grounds by Moritz v. Preiss*, 121 S.W.3d 715, 720–21 (Tex.2003). With respect to determination of the facts, we will

6. This "trial court" is the 295th District Court of Harris County, Texas.

7. Generally, courts have acknowledged that a third party's reliance on an attorney's representation is not justified when the representation takes place in an adversarial context. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999).

not substitute our judgment for that of the trial court. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992). Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless the decision is shown to be arbitrary and unreasonable. *Id.* at 840. On the other hand, review of a trial court's determination of the legal principles controlling its ruling is much less deferential. *Id.* A trial court has no discretion in determining what the law is or applying the law to the facts. *Id.* Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion and may result in appellate reversal. *Id.*

## Agreed Judgment

■ In general, a party may not appeal from or attack a judgment to which he has agreed, absent allegation and proof of fraud, misrepresentation, or collusion. *Henke v. Peoples State Bank of Hallettsville*, 6 S.W.3d 717, 720 (Tex.App.-Corpus Christi 1999, pet dism'd w.o.j.); *Bexar County Criminal Dist. Attorney's Office v. Mayo*, 773 S.W.2d 642, 644 (Tex.App.-San Antonio 1989, no writ); *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 562 (Tex. App.-Dallas 1989, no writ); *Charalambous v. Jean Lafitte Corp.*, 652 S.W.2d 521, 525 (Tex.App.-El Paso 1983, writ ref'd n.r.e.). Therefore, absent allegation and proof of fraud, misrepresentation, or collusion, appellants would not be entitled to a new trial.

## Fraud

■ Appellants argue that "AMF's lawyers knowingly agreed to insert false statements in the settlement documents to protect Smith and Hooper from divulging the aggregate settlement to their clients." The allegedly false statements were:

Defendants' payment of the settlement amounts stated herein are independent of its agreement to make payments to other plaintiffs in the same or related lawsuits. Plaintiff and Defendants have negotiated this settlement based upon the individual merits of the Plaintiff's claims. Defendants have not made any aggregate settlement offer and this settlement is not part of any aggregate settlement.

■ The elements of fraud are that: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex.2001) (orig.proceeding) (citing *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998)). As the trial court noted, "A crucial element to a fraud cause of action is reliance. Appellants all testified that they did not rely on any statements by appellees or on the contents of the settlement agreement with the alleged false statements or omissions." In fact, in their brief, appellants expressly concede that they did not rely on any statements by appellees or on the contents of the settlement agreement with the alleged false statements or omissions.

The trial court found that appellees did not commit actual fraud. We cannot say the trial court erred in so doing. Therefore, we hold that the trial court did not abuse its discretion by denying the motion for new trial on this basis. Because we construe appellants' issues 5 and 6 as relating to their allegations that appellees

committed fraud, we overrule issues 5 and 6.

### Conspiracy to Commit Fraud or Collusion

Similarly, we construe appellants' issues 3 and 4 as their argument that the trial court erred by denying the motion for new trial because appellees allegedly colluded with or conspired with appellants' trial counsel to commit fraud on appellants. The trial court held, "[T]here can be no conspiracy to commit fraud in the litigation setting." We agree.

In *Bradt v. West*, we found no cause of action by one attorney against his former adversary for litigation conduct. 892 S.W.2d 56, 71–2 (Tex.App.—Houston [1st Dist.] 1994, writ denied). We noted that an attorney must zealously represent his clients within the bounds of the law because "the public has an interest in 'loyal, faithful and aggressive representation by the legal profession.'" *Id.* at 71 (citing *Maynard v. Caballero*, 752 S.W.2d 719, 721 (Tex.App.-El Paso 1988, writ denied)).

Finding no private cause of action for litigation conduct, we opined:

> An attorney should not go into court knowing that he may be sued by the other side's attorney for something he does in the course of representing his client; such a policy would favor *tentative* representation, not the *zealous* representation that our profession rightly regards as an ideal and that the public has a right to expect. That policy would dilute the vigor with which Texas attorneys represent their clients, which would not be in the best interests of justice.

*Id.* at 72. Moreover, we explicitly noted that unmeritorious litigation conduct could properly be the subject of sanctions, not a private cause of action. *Id.* Other courts

have agreed that it is the type of conduct in which the attorney engages, not whether it was meritorious in the underlying lawsuit that governs a party's right to recovery against an adversary's former attorney. *See Taco Bell Corp. v. Cracken*, 939 F.Supp. 528, 532 (N.D.Tex.1996); *Chapman Children's Trust v. Porter & Hedges*, 32 S.W.3d 429, 440 (Tex.App.—Houston [14th Dist.] 2000, pet. denied).

Here the trial court noted, "All of the actions of the defendants were in connection with the settlement of a lawsuit." We cannot say the trial court abused its discretion in denying the motion for new trial on this basis. We overrule appellants' issues 3 and 4.

### Aggregate Settlements

Finally, as an alternative to fraud, collusion, or conspiracy to commit fraud, appellants argue that the settlement agreements and, therefore, the agreed judgment are void because the settlement agreements were undisclosed aggregate settlements and, as such, were void as against public policy. We disagree.

An aggregate settlement occurs when an attorney, who represents two or more clients, settles the entire case on behalf of those clients without individual negotiations on behalf of any one client. *Arce v. Burrow*, 958 S.W.2d 239, 245 (Tex.App.—Houston [14th Dist.] 1997) reversed in part on other grounds, *Burrow v. Arce*, 997 S.W.2d 229, 247 (Tex.1999); *see Scrivner v. Hobson*, 854 S.W.2d 148, 152 (Tex.App.—Houston [1st Dist.] 1993, orig. proceeding). The Texas Disciplinary Rules of Professional Conduct prohibit only *undisclosed* aggregate settlements.

> A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients ... unless each client has consented after consultation, includ-

ing disclosure of the existence and nature of all the claims or pleas involved and of the nature and extent of the participation of each person in the settlement.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.08(f) (1991), reprinted in TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon Pamph. 1997) (State Bar R. art. X, § 9).

Prior to the settlements, both sides conducted discovery, and they had numerous and lengthy discussions regarding individual cases as well as similarities and differences among the various cases. Moreover, in their authorizations to settle, each appellant acknowledged that his claim was *negotiated* with other similar claims. Appellants argue, essentially, that there were no specific, individual negotiations during the mediation, and there were not back-and-forth, demand-and-offer discussions after the mediation regarding their settlements. We find no authority—and they do not direct us to any—that proscribes the manner in which negotiations must occur or that requires haggling or horse-trading between the parties. After the mediation, appellants made settlement demands on appellees, based on factors specific to each of their claims, and appellees accepted their demands and paid them. This *is* the essence of negotiation.

Thus, there were individual negotiations on behalf of appellants. The Rule 11 agreement did not actually settle any case, let alone all of the cases as an aggregate settlement. No amount of money was stated in the Rule 11 agreement, and, indeed, the Rule 11 agreement did not bind the defendants to a lump sum to be paid to the plaintiffs' lawyers and divided among his clients. Shank testified that he had no settlement authority at the mediation. Later, appellees rejected one plaintiff's settlement demand.

In addition, as Shank explained in his deposition, each appellant's case was settled individually, after a lengthy negotiation process involving individual offers and acceptances. Shank explained that each settlement *had to be* negotiated individually in order to determine issues of insurance coverage and allocation. Therefore, we hold that the trial court erred in concluding that the settlements here were aggregate settlements. We overrule appellants' first issue. Because we conclude that the settlements at issue in this case were not aggregate settlements, we decline to address appellants' second issue, which asks whether undisclosed aggregate settlements are void as against public policy.

## Conclusion

We affirm the judgment of the trial court.

Justice KEYES, dissenting.

EVELYN V. KEYES, Justice, dissenting.

I withdraw my dissent that issued on August 28, 2008 and substitute the following opinion in its stead.

I respectfully dissent. Appellants are mass tort plaintiffs. In six issues, they argue, as they did in the trial court, that their individual settlement agreements are part of an undisclosed aggregate settlement agreement reflected in the agreed judgment and that both their individual settlement agreements and the agreed judgment are "void as against public policy" and should be set aside and a new trial ordered. Appellants contend the settlement agreement is void (1) because their trial counsel induced them to accept the aggregate settlement without disclosing that it was an aggregate settlement, without disclosing the existence and nature of all the claims involved in the aggregate

settlement, and without disclosing the nature and extent of the participation of each person in the settlement, in violation of Texas Disciplinary Rule of Professional Conduct 1.08(f) and (2) because appellees, defendants at trial, conspired with appellants' trial counsel to defraud appellants by making material misrepresentations and omissions regarding the nature of the negotiations and the settlement, both in the agreed judgment and in the settlement documents appellees drafted and that were presented to each plaintiff to secure his agreement to the agreed judgment. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.08(f) (1991), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 2005) (TEX. STATE BAR R. art. X, § 9).

I agree with appellants. I would hold that their individual settlement agreements and the agreed judgment are void as against public policy and must be set aside. Therefore, I would reverse the case and remand to the trial court for a new trial.

## BACKGROUND

Appellants were among over a hundred plaintiffs who brought several different suits against Tuboscope Vetco International, Inc., AMF, Inc., and Minstar, Inc., in 1998, along with other defendants, for injuries allegedly caused by their occupational exposure to silicosis while working for AMF Tuboscope in Midland, Texas.

In January 1999, appellants' trial attorneys, Shelton Smith and Scott Hooper, approached the appellees with settlement demands. In one letter, Smith wrote:

I am presently representing 55 former AMF Tuboscope sandblasters who suffer from silicosis or mixed dust pneumoconiosis as a result of their employment at Tuboscope. Each of these 55 men has a serious occupational lung disease. . . .

As of this date, I have filed 25 lawsuits against AMF, Inc. The other 30 diagnosed cases are ready to be filed. There may be more. . . .

Appellees' trial counsel questioned the diagnoses and the expertise of the diagnosing doctor, referred to prior settlements, and suggested a "global meeting" to discuss settlements in these cases.[1] About a month later, appellees' counsel again wrote to appellants' counsel, indicating, *inter alia,* that, "[a]t this point in time, my client and its insurers are not interested in negotiating a settlement in individual cases on a case-by-case basis" or "on a subgroup basis." Rather, "my client and its carriers are interested in a global settlement proposal. Accordingly, if you wish to resolve these cases, I would suggest that you proceed with preparing a global settlement proposal. . . . If the parties seem reasonably in contact with each other, then it may be appropriate for all parties to proceed with a global mediation. . . ." Appellees' counsel further indicated that "[t]o the extent that my client and its insurers are not able to proceed with a global resolution of these matters, . . . that my client and its insurers are not interested at this time in negotiating settlements on a piecemeal, case by case or subgroup basis."

Shortly thereafter, the parties went to mediation. About half of the plaintiffs were invited and told their cases might be discussed, and a few attended. They were instructed not to bring anyone else. Appellants' former counsel, Smith, later testi-

---

1. References in this opinion to "plaintiffs' counsel," "appellants' counsel," "defendants' counsel," "AMF's counsel," and "appellees' counsel" refer solely to the parties' trial counsel, not to any party's appellate counsel. Neither appellants nor appellees are represented by their trial counsel on appeal.

fied that his goal had been to settle all the claims for about $25 million. At mediation, each side had different criteria it wished to use to establish the value of each plaintiff's claim. The parties discussed a few cases individually as a means of reality testing the effect of the matrix criteria each side proposed, but they did not discuss settling the individual claim of any particular plaintiff.

After several days of mediation, appellees' attorney told the plaintiffs' counsel, Smith, that so long as the individual demands did not exceed $45 million he would recommend to his clients and their insurance carriers to settle the claims, but only if 95% of Smith's clients agreed. Smith agreed, and plaintiffs' and defendants' attorneys signed a Rule 11 agreement memorializing their understanding. At least twenty additional plaintiffs were added to the litigation after the mediation. Appellants then recalculated the settlement amounts for each plaintiff.

After the mediation, Smith sent each appellant a letter detailing an offer of settlement, based on numbers he had calculated using his matrix. The letters were substantially the same, except for the settlement amounts. The letters stated, in part:

> I, [name of client], understand and acknowledge that my attorney, Shelton Smith, has fully and completely investigated my claim for damages arising from my occupational lung disease.
>
> I understand and acknowledge that my attorney, Shelton Smith, has adequately, fully and competently worked up and prepared my claim for damages arising from my occupational lung disease.

> I understand and acknowledge that my claim was negotiated individually and not as part of any aggregate settlement.
>
> I understand and acknowledge that the AMF Defendants have made a final offer of $[spreadsheet figure for the client] to fully and finally compromise and settle all my claims against the AMF defendants.
>
> I understand and acknowledge that my attorney, Shelton Smith, has recommended and advised me to accept this settlement and that it is in the best [interest] of myself and my family to accept this settlement.

The settlement offers stated in the letters ranged from $209,000 to $662,000.[2] All but one or two of the 178 or 179 plaintiffs with pending claims agreed to settle.

To effectuate the settlements, appellee AMF prepared—and each of Smith's 177 settling clients, including each appellant, executed—a Settlement, Indemnity, Assignment and Release Agreement, as well as an affidavit and authorization to settle. Each settlement agreement provided in part:

> Plaintiffs and Defendants have been involved in lengthy settlement negotiations, involving a variety of settlement offers and proposals. This Agreement reflects the final settlement offer made by the Defendants and accepted by Plaintiff.... Defendants' payment of the settlement amounts stated herein are independent of its agreement to make payments to other plaintiffs in the same or related lawsuits. Plaintiff and Defendants have negotiated this settlement based on the individual merits of the Plaintiff's claims. Defendants have not made any aggregate offer and this settlement is not part of any aggregate settlement.

---

2. Anthony Authorlee ($488,000), Dexter Burnett ($384,000), Robert Derousselle ($209,-000), Floyd Moran ($314,000), Jerome Stubblefield ($384,000), John Young ($662,000).

Both appellees' counsel and appellants' former counsel testified that this language was requested by appellants' former counsel and inserted verbatim into the settlement documents by appellees' counsel.

The settlement documents drafted by AMF's counsel and presented to each plaintiff for his signature included a release of the settling defendants that released "any and all past, present or future claims ... arising out of or in any way connected with any and all claimed injuries allegedly sustained by Plaintiff," any and all claims "arising out of or in any way connected with those claims made by Plaintiff in the above-captioned action," and "any and all claims for bad faith settlement practices which might be asserted against Defendants and/or their insurers." In addition, each settlement agreement and accompanying settlement affidavit prepared by AMF and executed by each plaintiff contained a disclaimer of reliance, which stated:

> C) I have had the benefit of professional advice of attorneys and physicians of my choosing, I am fully satisfied with the advice, and have relied completely upon my own judgment together with that professional advice.

The trial court granted the settling plaintiffs' motion to consolidate their cases. The 80th District Court of Harris County then approved the underlying settlement agreements and found them to be "fair, reasonable, and just" and "in the best interests of the Plaintiffs and Defendants." On December 21, 1999, it entered an agreed judgment on the settlement (the "agreed judgment").

In 2002, four appellants and eleven other settling plaintiffs terminated their attorney-client relationship with Shelton Smith & Associates, engaged Robins, Cloud, Greenwood & Lubel, LLP, and moved to retain and sever their claims. The court granted their motion. In 2004, all six appellants sued Shelton Smith & Associates, and appellees, the settling defendants, alleging that Smith fraudulently induced them to enter into an aggregate settlement and that appellees conspired in that process. On May 8, 2006, the trial court severed appellants' claims, making the agreed judgment final as to them. Appellants then filed a motion for new trial, arguing that: (1) the settlement agreement was void because it violated the aggregate settlement rule in the Texas Rules of Professional Conduct, and, therefore, the agreed judgment was also void; (2) appellees Tuboscope Vetco, AMF, and Minstar committed actual fraud in connection with the settlement; and/or (3) Tuboscope Vetco, AMF, and Minstar conspired to commit fraud with appellants' trial counsel in connection with the settlement.

By order dated July 20, 2006, the trial court denied appellants' motion for new trial and made findings of fact and conclusions of law. The trial court found that appellants' trial attorney "violated Rule 1.08(f) of the Texas Disciplinary Rules, the 'aggregate settlement rule.'" However, relying on the dissent to the denial of the motion for rehearing in *Quintero v. Jim Walter Homes,* the trial court concluded that the violation did not void the agreed judgment. 709 S.W.2d 225, 232–33 (Tex. App.-Corpus Christi 1985, writ ref'd n.r.e.). Next, the trial court stated, "As fact finder, the court finds no actual fraud committed by the defendants in this case."

The court concluded that appellants could not prove reliance and that it is "unreasonable for a person to rely on statements of the opposing party in settling litigation." The court also concluded that "there can be no conspiracy to commit fraud in the litigation setting."

Appellants challenge the trial court's denial of their motion for new trial with six issues on appeal:

(1) Did the trial court correctly find that there was an aggregate settlement between the AMF defendants and the original six plaintiffs that sued them?

(2) Are undisclosed aggregate settlements void as a matter of public policy?

(3) If undisclosed aggregate settlements are void as a matter of public policy, are they nevertheless enforceable by defendants that enter into them with the knowledge that the Plaintiffs' lawyers have deceived their clients about the character of the settlement?

(4) If undisclosed aggregate settlements are void as a matter of public policy, are they nevertheless enforceable by defendants who collude with Plaintiffs' counsel and allow the Plaintiffs' lawyers to deceive their clients about the character of the settlement?

(5) If undisclosed aggregate settlements are void as a matter of public policy, are they nevertheless enforceable by defendants who knowingly include false representations in settlement agreements prepared by defendants?

(6) Does a defendant have a duty to provide all material information about the true nature of a settlement once he voluntarily includes misleading representations about the nature of the settlement in his settlement papers? If a defendant breaches such a duty and thereafter secures a settlement, should such a settlement and agreed judgment be set aside as a matter of law?

I would consider these issues together.

## STANDARD OF REVIEW

### Motion for New Trial

We review a trial court's denial of a motion for new trial for abuse of discretion. *In re R.R.*, 209 S.W.3d 112, 114 (Tex.2006) (per curiam). With respect to determination of the facts, we will not substitute our judgment for that of the trial court. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992). Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable. *Id.* at 840. On the other hand, review of a trial court's determination of the legal principles controlling its ruling is much less deferential. *Id.* A trial court has no "discretion" in determining what the law is or applying the law to the facts. *Id.* Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and it may result in appellate reversal. *Id.*

### Agreed Judgment

In general, a party may not appeal from or attack a judgment to which he has agreed, absent allegation and proof of fraud, misrepresentation, or collusion. *Henke v. Peoples State Bank of Hallettsville*, 6 S.W.3d 717, 720 (Tex.App.-Corpus Christi 1999, pet dism'd w.o.j.); *Bexar County Criminal Dist. Attorney's Office v. Mayo*, 773 S.W.2d 642, 644 (Tex.App.-San Antonio 1989, no writ); *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 562 (Tex. App.-Dallas 1989, no writ); *Charalambous v. Jean Lafitte Corp.*, 652 S.W.2d 521, 525 (Tex.App.-El Paso 1983, writ ref'd n.r.e.).

### Fraud and Civil Conspiracy

The elements of fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the

other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex.2001) (orig.proceeding) (citing *Formosa Plastics Corp. v. Presidio Eng'rs. & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998)). When fraud is used, a release or disclaimer of reliance and subsequent agreed judgment must be set aside regardless of exculpatory language in the release. *See Prudential Ins. Co. v. Jefferson Assocs. Ltd.*, 896 S.W.2d 156, 162 (Tex.1995); *Rodriguez v. Am. Home Assurance Co.*, 735 S.W.2d 241, 242 (Tex.1987); *Kolb v. Tex. Employers' Ins. Ass'n*, 585 S.W.2d 870, 871–72 (Tex.Civ. App.-Texarkana 1979, writ ref'd n.r.e.). The elements of civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *See Operation Rescue–Nat'l v. Planned Parenthood*, 975 S.W.2d 546, 553 (Tex.1998).

## DISCUSSION

The essential questions raised in appellants' six issues are (1) whether the individual settlement agreements are void as against public policy because the settlement was an undisclosed aggregate settlement that was actively misrepresented to each appellant as an individually negotiated settlement of his own case and, if so, (2) whether the agreed judgment is void and must be set aside. I would hold that the individual settlement agreements and the agreed judgment are void, and I would order that the settlement agreements and the agreed judgment be set aside and new trials granted.

An aggregate settlement occurs when an attorney who represents two or more clients settles the entire case on behalf of those clients without individual negotiations on behalf of any one client. *Arce v. Burrow*, 958 S.W.2d 239, 245 (Tex.App.- Houston [14th Dist.] 1997), *aff'd as modified, Burrow v. Arce*, 997 S.W.2d 229, 247 (Tex.1999); *see Scrivner v. Hobson*, 854 S.W.2d 148, 152 (Tex.App.-Houston [1st Dist.] 1993, orig. proceeding). There is nothing illegal about an aggregate settlement in itself. However, an attorney owes a duty of loyalty and good faith to each client, and, therefore, "it is the ethical duty of an attorney who represents multiple clients to obtain individual settlements for them unless those clients are informed and consent." *Burrow*, 958 S.W.2d at 245. Thus, when an attorney enters into an aggregate settlement without the informed consent of the affected clients, the attorney breaches the fiduciary duty owed those clients. *Id.*

Moreover, the aggregate settlement rule incorporated into the Texas Disciplinary Rules of Professional Conduct expressly requires full disclosure to each client of "the existence and nature of all the claims or pleas involved" and of "the nature and extent of the participation of each client in the settlement." Specifically, Texas Disciplinary Rules of Professional Conduct, Rule 1.08(f) states:

A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients . . . unless each client has consented after consultation, including disclosure of the existence and nature of all the claims or pleas involved and of the nature and extent of the participation of each person in the settlement.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.08(f).

It is undisputed that, in this case, appellants' counsel violated Rule 1.08(f). The plaintiffs' attorneys not only failed to dis-

close to their clients, including appellants, "the existence and nature of all the claims or pleas" involved in the settlement and "the nature and extent of the participation of each person in the settlement," they also actively misrepresented that the settlement was *not* an aggregate settlement when it was, that their claims had been individually negotiated when they had not been, and that the number of claimants was smaller than in fact it was. With only those unrebutted misrepresentations before them, each plaintiff signed an individual settlement agreement and affidavit and authorization of settlement. These individual agreements were then presented to the trial court by the parties and formed the basis of that court's finding that the settlement was fair and its approval of the agreed judgment reflecting the terms of the aggregate settlement. Therefore, appellants' counsel not only violated Rule 1.08(f) and breached their fiduciary duties to their clients, they also committed fraud. *See In re FirstMerit Bank,* 52 S.W.3d at 758 (reciting elements of fraud).

Very importantly, however, the misrepresentations and omissions were not confined to plaintiffs' counsel's representations to their clients. They were also included in the settlement agreements and affidavits prepared by *appellees'* counsel and relied upon and executed by each claimant, including each appellant, in effectuating the settlement. Not only did the Settlement, Indemnity, Assignment and Release Agreement drafted by appellees fail anywhere to state that the individual settlement was part of a negotiated $45 million total recovery for all clients represented by the Smith firm, but the Settlement, Indemnity, Assignment and Release Agreement presented to each plaintiff, including each appellant, to induce that plaintiff's agreement to the aggregate settlement, included the following falsehoods:

- Plaintiffs and Defendants have been involved in lengthy settlement negotiations, involving a variety of settlement offers and proposals.
- Defendants' payment of the settlement amounts stated herein are independent of its agreement to make payments to other plaintiffs in the same or related lawsuits.
- Plaintiff and Defendants have negotiated this settlement based on the individual merits of the Plaintiff's claims.
- Defendants have not made any aggregate offer;
- and this settlement is not part of any aggregate settlement.

Appellants argue that they were fraudulently induced to accept their individual settlements and to sign these documents to effectuate the aggregate settlement and procure the agreed judgment by the misrepresentations of appellees as well as by the omissions and misrepresentations of their own counsel. They urge this court to follow *Quintero v. Jim Walter Homes,* in which the Corpus Christi Court of Appeals set aside an aggregate settlement made in violation of Disciplinary Rule 5–106 as void as against public policy and void and reinstated an individual settlement procured for the Quinteros but not disclosed to them. *See* 709 S.W.2d at 227–30.

Appellees argue that, unlike appellants' former counsel, who had a fiduciary duty to his clients, they had no such duty and only inserted appellants' counsel's representations into the settlement documents without change at the request of appellants' counsel. They also point to the disclaimers of reliance and releases each plaintiff signed and to the plaintiffs' affirmative representations that they relied solely on the advice of their own counsel and on their own judgment in deciding to accept their individual settlements and to

authorize the agreed judgment. Appellees urge the Court to follow the dissent in *Quintero* on motion for rehearing, which would have followed "the established rule that the misconduct of one attorney [the plaintiff's attorney] will not vitiate a settlement agreement so that a litigant is not bound by the agreement." *Id.* at 236 (Benavides, J., dissenting).

The majority accepts the appellees' argument. Relying on the trial court's statement that "[a]ppellants all testified that they did not rely on any statements by appellees or on the contents of the settlement agreement with the alleged false statements or omissions," and citing appellants' 'concession' in their brief that "they did not rely on any statements by appellees or on the contents of the settlement agreement with the alleged false statements or omissions," the majority reasons that the "[t]he trial court found that appellees did not commit actual fraud" and that "[w]e cannot say the trial court erred in so doing." It, therefore, overrules appellants' fraud claims. *Authorlee v. Tuboscope*, 01-06–00719–CV, Op. at 119 (Tex.App.-Houston [1st Dist.] Aug. 28, 2008, no pet. h.).

The majority likewise agrees with the trial court's legal conclusion that "there can be no conspiracy to commit fraud in the litigation setting." *Id.* at 120. It observes that this Court has previously found "no private cause of action for litigation conduct." *Id.* at 120. Noting that the trial court in this case found that "[a]ll of the actions of the defendants were in connection with the settlement of a lawsuit," the majority again concludes that it "cannot say the trial court abused its discretion in denying the motion for new trial on this basis." *Id.* at 120.

Finally, the majority disagrees that the individual settlement agreements were part of an undisclosed aggregate settlement. *Id.* at 121. It finds, as a matter of fact, that "[p]rior to the settlements, both sides conducted discovery, and they had numerous and lengthy discussions regarding individual cases as well as similarities and differences among the various cases" and that "in their authorizations to settle, each appellant acknowledged that his claim was *negotiated* with other similar claims." *Id.* at 121. Concluding that "there were individual negotiations on behalf of appellants," it holds that "the trial court erred in concluding that the settlements here were aggregate settlements." *Id.* at 121.

The majority does not address *Quintero* or any of the other cases relied on by appellants, and it does not cite any applicable law in support of its legal conclusions or its holding.

Procedurally, I disagree with the majority's application of an abuse of discretion standard to the trial court's legal conclusions that there was no fraud in the settlement agreements and no civil conspiracy in this case. The trial court's conclusions of law are not binding on this Court and are reviewed de novo. *Eller Media Co. v. City of Houston*, 101 S.W.3d 668, 674 (Tex. App.-Houston [1st Dist.] 2003, pet. denied). I likewise disagree with the majority's application of a de novo standard of review to the facts of the case in determining, contrary to the finding of the trial court, that there was no aggregate settlement in this case. *See Walker*, 827 S.W.2d at 839.

On the merits, I disagree with the majority's holding that there is no fraud in this case because there is "no private cause of action for litigation conduct" and with its holding that the trial court erred in concluding that the individual settlements were part of an aggregate settlement.

First, this is not a case where one attorney has sued his adversary. Therefore, I find the majority's statement that there is

no cause of action in such a situation inapplicable to this case and inexplicable. Nor is it the case that defendants cannot be sued for their actions "in connection with the settlement of a lawsuit." *Authorlee,* 01–06–00719–CV, Op. at 120. Indeed, it is well established that they can be. *See, e.g., Quintero,* 709 S.W.2d at 227–30 (voiding aggregate settlement in suit brought by plaintiffs against their own counsel and defendants in underlying litigation); *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 178, 181 (Tex.1997) (holding that misrepresentations in settlement documents are actionable as fraud). Therefore, I cannot agree with the majority's conclusion that, on this issue as well, the trial court did not "abuse[ ] its discretion." *Authorlee,* Op. at 120.

Second, I cannot agree with the majority's factual conclusion that the agreed judgment is not an aggregate settlement and that the individual plaintiffs' claims were not settled as part of an aggregate settlement, and thus I cannot agree with its conclusion that the trial court erred in finding that the agreed judgment reflected an aggregate settlement. The majority's factual finding that the plaintiffs' claims were individually negotiated is belied by the record, which plainly shows that all claims were negotiated as part of a single global settlement of the claims of all plaintiffs represented by Smith for a fixed sum of money and apportioned according to a matrix agreed upon by counsel for both plaintiffs and defendants. Its conclusion that a single global settlement of the claims of multiple individual plaintiffs that satisfies these criteria is *not* an aggregate settlement is contradictory to the definition of an aggregate settlement in both *Burrow,* 958 S.W.2d at 245, and Rule 1.08(f) of the Texas Disciplinary Rules of Professional Conduct (the aggregate settlement disclosure rule).

I would hold that the agreed judgment reflects an aggregate settlement whose terms were not disclosed and, in fact, were actively misrepresented to appellants. I would further hold that appellees, the settling defendants, committed fraud and civil conspiracy in procuring the consent of appellants to their individual settlements and to the agreed judgment and that the individual settlement agreements and the agreed judgment are, therefore, void as against public policy and should be set aside.

Appellants do not allege that the defendants breached a fiduciary duty to them or violated Rule 1.08(f), like their own counsel. Rather, appellants sued appellees, the settling defendants, for the defendants' own false representations in the settlement documents the plaintiffs were required to sign to effectuate the settlement and for the defendant's conspiracy with the plaintiffs' attorneys in obtaining the individual plaintiffs' agreement to the aggregate settlement through false representations and material omissions. The question, therefore, is whether the false representations and material omissions in the Settlement, Indemnity, Assignment and Release Agreements are actionable under the circumstances of this case and, if so and if proved, what remedy should follow.

Material misrepresentations of fact and material omissions in settlement documents are actionable as fraud. *See Schlumberger,* 959 S.W.2d at 178, 181. "[W]here a contract is induced by fraud, there is in reality no contract because there is no 'real assent' to the agreement." *Id.* (quoting *Edward Thompson Co. v. Sawyers,* 111 Tex. 374, 234 S.W. 873, 874 (Tex.1921)). Therefore, "the defrauded party is not bound by any of the contractual provisions, 'including those relating to presentation or guaranties which induced its execution.'" *Id.* (quoting *Edward*

*Thompson Co.,* 234 S.W. at 874–75). In order to vitiate the contract, however, "the fraud must be such that it 'prevents the coming into existence of any valid contract at all.'" *Id.* (quoting *Distributors Inv. Co. v. Patton,* 130 Tex. 449, 110 S.W.2d 47, 48 (Tex.1937)). Fraud by nondisclosure is a subcategory of fraud because, when a party has a duty to disclose, nondisclosure may be as misleading as a positive misrepresentation of fact. *Id.* Reliance is an element of a claim of fraud by non-disclosure, as it is for any other type of fraud. *See id.* Moreover, a release containing a disclaimer of reliance (such as that in the settlement documents provided each plaintiff in this case) is a contract, and, like any other contract, it is subject to avoidance on grounds of fraud or mistake. *Id.* at 178, 110 S.W.2d 47. Whether a disclaimer of reliance precludes a fraudulent inducement claim depends on "[t]he contract and the circumstances surrounding its formation." *Id.* at 181, 110 S.W.2d 47.

In this case, quite apart from appellants' counsel's duty of disclosure, appellees had a duty not to make misrepresentations of fact in the Settlement, Indemnity, Assignment and Release Agreements that they drafted and that they required 95% of the plaintiffs represented by the Smith firm to sign in order to effectuate the agreed judgment. Nevertheless, appellees knowingly incorporated false information into each Settlement, Indemnity, Assignment and Release Agreement, which the plaintiffs' attorneys then presented to their clients for execution, and then, with the plaintiffs' attorneys, appellees presented the executed individual settlement agreements, affidavits, and authorizations to settle to the trial court, causing the court to accept the terms of the aggregate settlement as fair and to approve the agreed judgment.

The settling defendants knew that the settlement agreement was an aggregate settlement for a total sum of $45 million, yet they failed to disclose that material fact in any of the individual Settlement, Indemnity, Assignment and Release Agreements, affidavits, and authorizations to settle they drafted. They also knew that no plaintiff's claims had been individually negotiated and settled. Rather, an interdependent matrix agreed upon by plaintiffs' and defendants' counsel had been used to decide the value of each plaintiff's claim. And they knew that after a sum had been apportioned to each individual claimant in accordance with the matrix, additional plaintiffs had been added who shared in the same total aggregate settlement, reducing each plaintiff's original individual settlement.

Yet, knowing each of these material facts, and knowing, as attorneys, that Rule 1.08(f) of the Texas Rules of Disciplinary Rules of Professional Conduct required disclosure to each of the settling plaintiffs of "the existence and nature of all the claims or pleas involved and of the nature and extent of the participation of each person in the settlement," the settling defendants withheld the information that each plaintiff's settlement was part of a $45 million aggregate settlement, and they falsely represented to each plaintiff in documents they drafted that "Defendant's payment of the settlement amounts stated herein are independent of its agreement to make payments to other plaintiffs in the same or related lawsuits"; that "Plaintiff and Defendants have negotiated this settlement based on the individual merits of the Plaintiff's claims"; and that "Defendants have not made any aggregate offer and this settlement is not part of any aggregate settlement."

Appellees not only should have known of the falsity of these statements, which they

claim were simply passed on to them by appellants' counsel, they plainly did know. And they knew the purpose to which these false statements were intended to be put: they were intended by both plaintiffs' counsel and the settling defendants to be presented to the individual settling plaintiffs to secure their agreement to the terms of the aggregate settlement, to the benefit of both plaintiffs' counsel and the settling defendants. With both their own counsel and appellees' counsel's collusion in the misrepresentations made to them, appellants were in no position to discover the truth regarding the aggregate settlement they were induced to approve. Instead, they relied upon the representations in the documents provided to them, as evidenced by their signatures accepting the factual representations in those documents as the basis for their authorization of the settlement of their cases. Plaintiffs' counsel and the settling defendants then presented the individual signed Settlement, Indemnity, Assignment and Release agreements, affidavits, and authorizations to settle to the trial court as evidence that the settlement was "fair and reasonable" in order to procure the court's approval of the settlement terms and the agreed judgment. This is fraud under Texas law. *See In re FirstMerit Bank*, 52 S.W.3d at 758 (reciting elements of fraud).[3] Nor can I agree that, under the circumstances of this case, appellants are held to their disclaimer of reliance on appellees' representations. *See Prudential Ins. Co.*, 896 S.W.2d at 162 (holding that when fraud is used, release or disclaimer of reliance and subsequent agreed judgment must be set aside).

Because plaintiffs' counsel and the settling defendants agreed upon their course of action and cooperated in achieving the goal of obtaining the plaintiffs' acceptance of the terms of the aggregate settlement and the trial court's approval of the agreed judgment on the basis of false representations and material omissions, these facts also rise to the level of civil conspiracy. *See Operation Rescue–National*, 975 S.W.2d at 553. I thus cannot agree with the majority's conclusion holding that "there can be no conspiracy to commit fraud in the litigation setting," which simply adopts the trial court's legal conclusion. *See Authorlee*, Op. at 120.

I would hold that, under the circumstances of this case, appellees clearly committed fraud in drafting the settlement agreements, authorizations of settlements, and disclaimers they included in the agreements they knew were to be presented to appellants by their counsel to effectuate the agreed judgments. They then conspired with appellants' counsel to insure that 95% of the fraudulent agreements they drafted were executed as a pre-condition to effectuating the aggregate settlement and presenting the individual settlement agreements and the agreed judgment to the court. Therefore, I would hold that the settlement agreements and the agreed judgment are void as against public policy and that appellants are entitled to have them set aside. *See Schlumberger*, 959 S.W.2d at 181.

This holding is supported by the only other Texas law directly on point. Indeed, the scenario in this case is virtually identical to that in *Quintero*, 709 S.W.2d 225, urged by appellants, in which the Corpus

---

3. I would hold that the injury to the plaintiffs consisted in their not being able to present their claims individually and in their being lured into an aggregate settlement in which they were prevented by the actions of counsel on both sides from determining whether their claims were settled fairly vis a vis the other plaintiffs. In other words, the harm consisted in their being bound by their counsel's and the defendant's fraudulent actions and conspiracy to a settlement agreement made in violation of public policy.

Christi Court of Appeals held that an aggregate settlement agreement in which the Quinteros' claims were included was void as against public policy. In that case, the Quinteros' attorney, Hector Gonzales, had filed a lawsuit on their behalf against Jim Walter Homes for violations of the Texas Deceptive Trade Practices Act and the Consumer Credit Code. However, because Gonzales had several hundred other similar cases, he arranged for another attorney, Francis Gandy, to try the Quinteros' claims, with the result that the Quinteros received a substantial verdict in their favor. *Id.* Meanwhile, Gonzales negotiated an aggregate agreement for all his clients, including the Quinteros. Unaware of the verdict obtained by Gandy, the Quinteros agreed to share in the settlement and signed a release of their claims against Jim Walter Homes. *Id.* at 227–28. Gonzales and Jim Walter Homes then moved to dismiss the Quinteros' suit as a condition precedent to effectuation of the aggregate settlement. *See id.* Upon being informed by Gandy of the much larger verdict in their favor, the Quinteros revoked their consent to the motion to dismiss their individual suit. *Id.* at 228. The attorneys for Jim Walter Homes nevertheless filed the motion to dismiss the Quinteros' individual suit with the trial court, which granted it. *Id.*

On appeal, the supreme court ordered that the dismissal of the Quinteros' suit be set aside, and it remanded the case to the trial court to determine whether Jim Walter Homes could plead and prove an enforceable settlement agreement under the release signed by the Quinteros. *Quintero v. Jim Walter Homes, Inc.,* 654 S.W.2d 442 (Tex.1983). On remand, the trial court held that the release was valid and enforceable, although it found that Gonzales had violated former Rule 5–106, now Rule 1.08(f), by not informing the Quinteros of the nature and settlement amounts of all

claims involved in the aggregate settlement and although it found that the Quinteros had not been given a list showing the names and amounts to be received by the other plaintiffs, as also required by the aggregate settlement disciplinary rule. 709 S.W.2d at 228–29. The Quinteros appealed again, arguing that, because Gonzales violated the Code of Professional Responsibility in the method by which he acquired their consent, the release and settlement agreement were unenforceable. *Id.* at 229.

The Corpus Christi Court of Appeals, relying on *Fleming v. Campbell,* 537 S.W.2d 118 (Tex.Civ.App.-Houston [14th Dist.] 1976, writ ref'd n.r.e.), agreed with the Quinteros. *Quintero,* 709 S.W.2d at 229. The *Quintero* court pointed out that, in *Fleming,* the Court of Appeals had addressed the enforceability of a contract formed in violation of a Disciplinary Rule DR 2–107, which provided that a lawyer may not divide his fee with another, non-affiliated lawyer unless the client consents after full disclosure of the fee division arrangement; the *Fleming* court had held that the fee agreement procured without full disclosure was "as a matter of law against the public policy expressed in Disciplinary Rule 2–107 that no attorney's fees shall be divided unless the client's consent is obtained after full disclosure"; and the *Fleming* court had, therefore, concluded that the fee agreement, *"being violative of law and public policy is void and unenforceable." Id.* (quoting *Fleming,* 537 S.W.2d at 119). The *Quintero* court reasoned analogously to the *Fleming* court:

> Like DR 2–107, DR 5–106 [now Rule 1.08(f) ] requires that the client be *fully informed* before his consent to an agreement is obtained. Although the decision in *Fleming* was also supported on another theory, namely lack of consideration for the alleged con-

tract, we find the reasoning of the *Fleming* court, as quoted above, to be sound. The policy expressed in DR 5–106 is clearly to ensure that people such as the Quinteros do not give up their rights except with full knowledge of the other settlements involved. That policy was violated when Gonzalez did not inform the Quinteros of the matters required by DR 5–106.

*Id.* Like the *Fleming* court before it, the *Quintero* court observed, "Courts will not enforce contracts made in contravention of the law or public policy of this State." *Id.* (citing *Woolsey v. Panhandle Ref. Co.,* 131 Tex. 449, 116 S.W.2d 675 (1938); *Dodd v. Harper,* 670 S.W.2d 646, 650 (Tex.App.-Houston [1st Dist.] 1983, no writ)); *cf. Baron v. Mullinax, Wells, Mauzy & Baab, Inc.,* 623 S.W.2d 457 (Tex.App.-Texarkana 1981, writ ref'd n.r.e.). It held, therefore, that the contract for the release and settlement of the Quinteros' cause of action was void and unenforceable, and it reversed and remanded the cause to the trial court with instructions to reinstate the verdict in favor of the Quinteros in their individual suit. *Id.* at 229, 231.

I would hold that the exact same reasoning applies to the facts of this case and mandates the same result.

I realize that the result I believe mandated by this case is harsh when the agreed judgment settled the claims of 177 plaintiffs for a large aggregate sum of money that may well be fairly apportioned among the claimants, as the trial court found, and when that agreed judgment allowed the defendants to put the uncertainty of litigation over numerous similar claims behind them once and for all for a fixed sum of money. Nevertheless, I cannot agree with the proposition that counsel for the parties to an aggregate settlement may collude to avoid making the disclosures required by the disciplinary rules to procure an aggregate settlement, that attorneys may even actively misrepresent the nature of the settlement to unsophisticated litigants, and that the courts, in turn, may turn a blind eye to such wrong-doing out of an apparently equitable concern that a large aggregate settlement that benefitted many people, both plaintiffs and defendants, not be disturbed. Not to insist that the disclosure rule governing aggregate settlements be followed in this case is to permit the rule to be disregarded in every case.

Accordingly, I would sustain appellants' first and second issues on appeal.

### Conclusion

I would reverse the judgment of the trial court and render judgment that appellants' individual settlement agreements and the agreed judgment in the underlying case are void as against public policy. I would remand the case to the trial court with orders that appellants' settlement agreements and the agreed judgment be set aside and that appellants be granted a new trial on their claims.